Genevieve SCARFO, et al.,
Plaintiffs–Appellees,

v.

CABLETRON SYSTEMS, INC., et
al., Defendants–Appellants.

Genevieve SCARFO, Plaintiff–Appellant,

v.

CABLETRON SYSTEMS, INC., et
al., Defendants–Appellees.

Brian Miller, Plaintiff–Appellee.

Brian MILLER, Plaintiff–Appellant,

v.

CABLETRON SYSTEMS, INC.,
et al., Plaintiffs–Appellees.

Genevieve A. Scarfo, Defendant–Appellee.

Nos. 94–1929, 94–1982, and 94–1983.

United States Court of Appeals,
First Circuit.

Heard Jan. 12, 1995.

Decided May 12, 1995.

Anil Madan, with whom Madan and Madan, P.C., Boston, MA, and Elizabeth Bartholet, Cambridge, MA, were on brief, for defendants.

Eleanor H. MacLellan, with whom Carol A. Fiore and Sulloway & Hollis, Concord, NH, were on brief, for Genevieve A. Scarfo.

Andru H. Volinsky, with whom Michael J. Sheehan and Shaheen, Cappiello, Stein &

Gordon, P.A., Concord, NH, were on brief for, Brian Miller.

Before CYR and BOUDIN, Circuit Judges, and KEETON,* District Judge.

· KEETON, District Judge.

Two plaintiffs and two defendants cross-appeal from a final judgment after jury trial. The plaintiffs Genevieve Scarfo and Brian Miller are former employees of defendant Cabletron Systems, Inc. ("Cabletron"). Craig Benson and Robert Levine, supervisory employees of Cabletron, were also defendants in the district court.

Plaintiff Scarfo claimed, *inter alia*, that defendants discriminated against her on the basis of her sex and terminated her employment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–5(f).

Plaintiff Miller claimed, *inter alia*, under Title VII for retaliatory discharge based on his alleged refusal, as plaintiff Scarfo's immediate supervisor, to discriminate against her by terminating her employment on the basis of her sex.

The principal claims of error asserted on appeal challenge instructions to the jury. Each party opposing a claim of error asserts that no timely objection or request was made in the trial court.

Counsel representing defendants on appeal first came into the case after completion of the jury trial. Not surprisingly, they seek to present contentions substantially different from those presented by defense counsel during and before the jury trial. Whenever new counsel enter and raise new contentions, opposing counsel may find irresistible the temptation to counter with new contentions of their own. Almost inevitably, then, the entry into a case of new counsel for one party increases litigation burdens for all parties. An award of attorneys' fees to a prevailing party may offset this burden in part. But unfairness may remain to opposing parties if the trial or appellate court allows new grounds of claim or defense to be asserted. For this reason, among others, we encounter a threshold question in this case.

One way of framing the threshold question neutrally, abjuring "plain error," *United States v. Marder*, 48 F.3d 564, 569–72 (1st Cir.1995), "waiver," *id.* (citing *United States v. Olano*, —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)), "forfeiture," *id.*, "invited error," *id.*, "abandon[ment]," *United States v. Smith*, 46 F.3d 1223, 1235 (1st Cir.1995), and other terminology freighted with connotations, is to ask: Should we hold that the appellant (or cross-appellant) on each claim of error now before us is not entitled to be heard on the merits of that contention in the circumstances of this appeal?

Searching for the answer requires that we consider procedures for deciding mixed law-fact issues that involve unsettled law, genuine disputes of fact, and the exercise of discretion by jury, or judge, or both. The search requires also that we take account of Supreme Court and circuit decisions handed down after this case was argued, including *O'Neal v. McAninch*, —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *Lebron v. National Railroad Passenger Corp.*, —— U.S. ——, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995); *United States v. Smith*, 46 F.3d 1223 (1st Cir.1995); and *United States v. Marder*, 48 F.3d 564 (1st Cir.1995).

In describing the tasks of trial and appellate courts in circumstances of this degree of complexity, commentators and opinion writers have invoked imagery of the almost impenetrable. They have spoken, for example, of the "esoteric," *Marder*, 48 F.3d at 570, "The Bramble Bush," Karl N. Llewellyn, *The Bramble Bush* (1930), or—in a more venerable and ominous allusion—a "Serbonian Bog," *Landress v. Phoenix Mut. Life Ins. Co.*, 291 U.S. 491, 499, 54 S.Ct. 461, 463, 78 L.Ed. 934 (1934) (Cardozo, J., dissenting) ("The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog.").

The imagery, even if hyperbole in the classic sense of a figure of speech rather than an assertion to be taken literally, may nevertheless aptly call attention ·to the increasing

---

* Of the District of Massachusetts, sitting by designation.

intricacy of a rapidly evolving jurisprudence of procedural preclusion.

We conclude that we need enter only a little way into this maze of precedents, and on a well-marked path, to decide the case now before us. This is so because rules and precedents have erected a gate at the point of entry upon each potentially promising path through the maze, and each gate is closed to appellants whose contentions have the particular characteristics of those before us in this appeal. Thus, we affirm in substance, though with minor exceptions, and with some modification of amounts of awards, and on condition that a judgment amended as to form be entered in the district court.

We first explain the terms of the judgment that was ordered in the district court and the nature of the claims of error. Then we explain why, in the interests of justice, we hold that each claim of error asserted in this appeal is either harmless error or is raised too late for review under the harmless error standard and cannot be sustained under the more rigorous requirement that relief is to be granted only to avoid a miscarriage of justice.

## I.

The first error we address is one not raised by the parties. We consider it because it might be thought to have jurisdictional implications. The "final judgment" entered in this case was, in its form, not literally in compliance with the requirement that "[e]very judgment shall be set forth on a separate document." Fed.R.Civ.P. 58.

The district court made not one but a series of orders. In most instances, the order is not self-explanatory. Instead, it refers to an opinion or memorandum of the court to which one must go to understand precisely the meaning of the order. In these circumstances, if, for example, a party seeks enforcement of the judgment—perhaps even after the case is closed and the file is sent to storage—the parties and any other person required to act will have great difficulty finding out what exactly were the terms of the "final judgment."

In support of our jurisdiction, however, we conclude that the district court ordered the functional equivalent of a "final judgment" in a sequence of orders that includes:

the "Judgment" of May 10, 1994 (incorporating, first, the Order of June 2, 1993 granting in part and denying in part defendants' Motion to Dismiss; second, the Endorsed Order of November 17, 1993 concerning the defendants' Motion for Summary Judgment; third, the Special Verdicts of May 4, 1994; fourth, the Order of May 9, 1994, concerning the Court's Calculation of Title VII Damages);

the Order of July 19, 1994 on Miller's Motion for Prejudgment Interest;

the Order of July 19, 1994 on Miller's Motion for Attorneys' Fees;

the Order of July 19, 1994 on Scarfo's Motion for Attorneys' Fees; and

the Order of July 20, 1994 on Scarfo's Motion for Prejudgment and Postjudgment Interest.

Were we to remand for entry of a "final judgment" that is formally in full compliance with Rule 58, before deciding the appeal that has now been briefed and argued, the case would in due course be back before us again with precisely the same issues to be decided as those we perceive from the record now before us. To avoid the delay and waste of resources incident to such a remand, we proceed to consider the issues now and will direct entry of an appropriate amended judgment on remand.

From close examination of the several orders and memoranda identified above, we conclude that a final judgment of the substance gleaned from all these orders would have recited provisions in substance as follows:

(a) judgment for plaintiff Scarfo on her claim under Title VII of the Civil Rights Act for sex discrimination against defendants Cabletron and Benson for the sum of $1,187,901.07 (consisting of the sum of $242,407.07 in back pay, $744,744 in front pay, and $228,750 for the value of stock, reduced by the jury's award of $28,000 under the Equal Pay Act, paragraph (d)

below, in order to prevent duplicate recovery) without prejudgment interest;

(b) judgment for defendant Levine on Scarfo's Title VII claim for sex discrimination against him;

(c) judgment for defendants Cabletron, Benson, and Levine on plaintiff Scarfo's claim under Title VII of the Civil Rights Act for sexual harassment based on a hostile or abusive environment;

(d) judgment for plaintiff Scarfo against Cabletron (but not against Benson or Levine), on her claim under the Equal Pay Act, in the sum of $28,000 without prejudgment interest;

(e) judgment for defendants Benson and Levine on plaintiff Scarfo's claim for intentional or reckless infliction of emotional distress;

(f) plaintiff Scarfo's claim of intentional infliction of emotional distress against defendant Cabletron is dismissed;

(g) plaintiff Scarfo's claims for breach of contract and defamation are dismissed;

(h) judgment for plaintiff Miller against defendants Cabletron and Benson, on his claim for retaliatory discharge in violation of Title VII, in the sum of $1,391,711.85 (consisting of $190,651.85 in back pay, $995,000 in front pay, and $206,060 for the value of stock options) without prejudgment interest;

(i) judgment for plaintiff Miller against defendant Cabletron (but not against Benson) on his claim under New Hampshire state law for wrongful termination, in the sum of $995,000 with prejudgment interest at a per annum rate of ten percent under New Hampshire state law from the date of filing, April 14, 1992, to the date of the verdict, May 4, 1994;

(j) plaintiff Miller's claims of abuse of process and intentional or reckless infliction of emotional distress against Benson, Levine, and Cabletron are dismissed;

(k) all claims by plaintiff Miller against defendant Levine are dismissed;

(*l*) it is further ordered that plaintiff Miller will not be allowed to collect more than the larger of the two awards in his favor against Cabletron as set forth in paragraphs (h) and (i).

The substance of paragraph (*l*) is not explicitly stated in any of the orders identified above. Implicit in those orders and the basis on which they are explained in the memoranda referred to, however, is an assumption that the awards to plaintiff Miller overlap. Because duplicative collection would be impermissible, we conclude it is appropriate to interpret the trial court's orders as providing that Miller not be allowed to collect more than the larger (i.e., the Title VII award) of the two awards against Cabletron. *See* Part XIV, *infra*.

On July 19, 1994, the district court awarded attorneys' fees and disbursements to plaintiffs. Thus, two more paragraphs, as stated below, may be added to reflect the entire substance of a final judgment that includes awards of attorneys' fees. These provisions, we note, might have been made in a later order, rather than in the "final judgment" itself. *See* Fed.R.Civ.P. 54(d)(2). These paragraphs are as follows:

(m) judgment for plaintiff Scarfo against defendants Cabletron and Benson, for attorneys' fees and disbursements, in the amount of $244,255.13 (consisting of $225,-300.13 incurred for services of one and $19,955 incurred for services of the other of two firms that represented her);

(n) judgment for plaintiff Miller against defendants Cabletron and Benson, for attorneys' fees and disbursements, in the amount of $117,510.97.

The Order of July 20, 1994, which was the last of the series of Orders constituting the functional equivalent of a Final Judgment, also requires the addition of one more paragraph:

(o) Post-judgment interest is allowed on the awards in paragraphs (a), (d), (h), (i), (m), and (n).

Defendants–Appellants Cabletron and Benson appeal from the judgment entered against them on multiple grounds. Insofar as the judgment was in favor of the defendants, Plaintiffs–Cross–Appellants Scarfo and Miller also appeal on multiple grounds.

## II. CLAIMS OF ERROR IN THE CHARGE TO THE JURY

### A. Defendants' Appeal from Judgment on Scarfo's Sex Discrimination Claim

Defendants ask us to vacate the judgment for Scarfo against them on her Title VII claim because of erroneous instructions to the jury.

■ On the element of causation in Scarfo's Title VII claim, the trial judge instructed the jury:

Ms. Scarfo may prove her claims; that is, make out a prima facie case, in one of two ways. First she may *simply produce evidence* that her gender was a factor which motivated the defendants in making the challenged employment decisions. *[Ms. Scarfo h]aving done so, the defendants are liable even if they would have made the same decisions absent the discriminatory motive.* Second, she may also establish a prima facie case without direct evidence of discriminatory intent by producing indirect evidence which is sufficient to raise a presumption that absent any other explanation the defendants acted for discriminatory reasons. She need not prove that Cabletron acted with any discriminatory intent.

We conclude, as defendants contend, that this instruction was flawed in its treatment of the issue of causation. The instruction understated plaintiff's burden of proof as initially defined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and further developed in later cases.

Before the trial court charged the jury, defendants filed an appropriate request for. jury instruction, correctly stating a rule of law declared in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). But defendants did not object after the charge was given to the jury, as required by Rule 51 of the Federal Rules of Civil Procedure.

To what extent can the defendants now be heard on this claim of error? We return to this question in Part IV below.

### B. Defendants' Appeal from Judgment on Scarfo's Equal Pay Act Claim

Defendants ask us to vacate the judgment for Scarfo against them on her claim under the Equal Pay Act ("EPA") because of erroneous instructions to the jury.

Specifically, they contend that the trial judge failed to give any instruction on causation or on statutory defenses to liability.

The trial judge's instructions on the EPA claim included the following:

Ms. Scarfo alleges that Cabletron discriminated against her based on her sex in violation of the federal Equal Pay Act law. Ms. Scarfo need not prove that Cabletron intended to discriminate against her. In comparing her work to that of higher paid men, Ms. Scarfo need not show that her work was precisely equal, but only that it was substantially equal.... Ms. Scarfo need only show unequal pay as compared with one male employee.... If you find that Cabletron violated the Equal Pay Act, she is entitled to recovery for unpaid wages.

The special verdict form submitted to the jury contained the following question:

[D]o you find that during the course of Ms. Scarfo's employment Cabletron paid her at a lower rate than it paid men who performed jobs requiring substantially equal skill, effort and responsibility and involving similar working conditions?

The jury was instructed to make a finding of damages if they answered this question in the affirmative.

Defendants made no objection, within the time prescribed in Rule 51, either to the question on the verdict form or to the instructions. Thus, they failed to call to the trial judge's attention the alleged lack of any instruction on causation or on statutory defenses to Scarfo's EPA claim.

We return to this alleged error in Part V, below.

### C. Plaintiff Scarfo's Appeal of Her Hostile Environment Claim

Plaintiff–Cross Appellant Scarfo argues on cross-appeal that the court's instruction on her sexual harassment claim was erroneous.

The trial court instructed the jury as follows:

> In order to establish a prima facie case for sexual harassment under Title VII of the Civil Rights Act, [Scarfo] must prove the following *elements* by a preponderance of the evidence. One, she was subject to unwelcome sexual conduct. Two, unwelcome sexual conduct was based upon [her] sex. Three, the unwelcome sexual conduct was so severe or pervasive that it had the effect of creating an abusive working environment *that unreasonably interfered with her work performance.*

After the jury charge was given, plaintiff's counsel made an objection to the court as follows:

> In this instruction that was given, this wording on the elements that she has to prove the sexual harassment claim has the wording in it "that unreasonably interfered with Plaintiff Scarfo's work performance," and I think the way it was read, that comes out as sounding like an element that she has to prove, and the *Harris* case, which we had requested instruction on, . . . [states that] that's one factor that can be considered, but it's not an element of her claim.
>
> And we had requested . . . a paragraph that was not given but that comes from the recent *Harris* case that says that you don't have to have the unreasonable interference with work performance. It can be harassment that affects the psychological well-being and detract[s] from one's work and we would like to have that instruction given and a clarification that this isn't an element she has to prove.

We return to this matter in Part VI, below.

### D. Plaintiff Miller's Appeal of His Wrongful Discharge Claim

Plaintiff–Cross Appellant Miller argues on cross-appeal that the court's instruction on damages with respect to Miller's wrongful discharge claim was erroneous.

There are three types of damages at issue in this case: "pecuniary damages," such as damages for economic harm; "non-pecuniary damages," such as damages for pain and suffering; and "enhanced compensatory damages," claimed under New Hampshire law. The parties do not contest, and for present purposes we assume, that "enhanced compensatory damages" may be awarded in the discretion of the jury if the defendant's conduct was particularly egregious.

*See, e.g., DCPB, Inc. v. City of Lebanon,* 957 F.2d 913 (1st Cir.1992) (New Hampshire law).

Miller argues that the court erred in refusing to instruct the jury on nonpecuniary damages. Defendant Cabletron asserts that, in fact, the court did instruct the jury on nonpecuniary damages.

We return to this matter in Part VII, below.

### III. PROCESS, PRECLUSION, AND STANDARDS OF REVIEW FOR ALLEGED ERRORS IN CHARGING THE JURY

Rule 51 of the Federal Rules of Civil Procedure states in relevant part:

> No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.

Fed.R.Civ.P. 51.

If a party complies with Rule 51, then the "harmless error" standard of Rule 61 governs the trial or appellate court's consideration of any request for relief based on the alleged error. The court is directed not to treat as a ground for granting a new trial, or setting aside a verdict, or vacating or modifying a judgment or order, any error or defect or anything done or omitted by the court

> unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61. The recent decision in *O'Neal v. McAninch,* —— U.S. ——, 115

S.Ct. 992, 130 L.Ed.2d 947 (1995), directs reviewing judges to inquire, when determining whether an alleged error is harmless, whether they are "in grave doubt about the likely effect of an error on the jury's verdict," *id.* at ——, 115 S.Ct. at 994; if the court does have a grave doubt, then the error must be held harmful. A party who does not timely object in accordance with Rule 51, however, does not have the benefit of review under Rule 61, either before the trial court (on a post-trial motion) or on appeal.

■ If review is allowed at all at the instance of a party who did not comply with Rule 51, it is under a standard requiring substantially more than that the party show that the error was harmful (the Rule 61 standard). It has long been settled that, in general, an objection or request for jury instruction not made in compliance with Civil Rule 51 cannot be raised successfully on appeal. *Roto–Lith, Ltd. v. F.P. Bartlett & Co.*, 297 F.2d 497, 500 (1st Cir.1962). The rule has been rigorously enforced in this circuit, and its clear language will be overlooked "only in exceptional cases or under peculiar circumstances to prevent a clear miscarriage of justice," *Elgabri v. Lekas*, 964 F.2d 1255, 1259 and n. 1 (1st Cir.1992), or "where the error 'seriously affected the fairness, integrity or public reputation of judicial proceedings,'" *Lash v. Cutts*, 943 F.2d 147, 152 (1st Cir.1991) (quoting *Smith v. Massachusetts Inst. of Technology*, 877 F.2d 1106, 1110 (1st Cir.), *cert. denied*, 493 U.S. 965, 110 S.Ct. 406, 107 L.Ed.2d 372 (1989)).

A rigorously enforced timeliness principle is fundamental both to fair process and to avoiding adverse effect on substantial rights of the parties. Under such a principle, a clearly defined opportunity to present a contention must be exercised at a precisely defined time in the trial proceedings. It is a now-or-never opportunity that a party must, at that precise time, use or lose. *Cf. Arenson v. Southern Univ. Law Ctr.*, 43 F.3d 194, 198 (5th Cir.1995) (invoking the phrase "use it or lose it" in relation to timeliness of motions for judgment as a matter of law and, alternatively, for a conditional new trial).

One of these contexts is the preparation of the charge to the jury, including the specific phrasing of any questions submitted to the jury. The moment immediately before the jury retires to deliberate is a time when hard choices, with significant consequences, must be made by the parties and by the trial judge. Interests of fairness to each party weigh heavily in favor of requiring that every other party, at this critical moment, use or lose any right to assert that the trial court should change in some way the court's instructions to the jury on the substantive law governing the case. It is awkward to change instructions after the jury has commenced deliberating, and as a practical matter, once the jury has been disbanded after returning a verdict, it can never be called back to receive the corrected charge that the trial court might have given if asked at the right time to do so.

Failure to exercise the right to object to the court's charge at the critical moment prescribed by Rule 51 results in the loss of an opportunity for review under a standard no more burdensome for the appellant than the harmless error standard. Unless the reviewing court concludes that the charge has caused a miscarriage of justice or has undermined the integrity of the judicial process, the charge is treated as having an effect closely analogous to law-of-the-case doctrine, and for similar reasons of policy and fairness of process. *Moore*, 47 F.3d at 11.

The use-or-lose principle applies with special force to mixed law-fact issues. *Cf. Cheshire Medical Ctr. v. W.R. Grace & Co.*, 49 F.3d 26, 35 (1st Cir.1995) (citing *Chellman v. Saab–Scania AB*, 138 N.H. 73, 637 A.2d 148, 151 (1993)) ("Clear and intelligible jury instructions are particularly important to explain complex or confusing legal concepts."). If the trial counsel and the trial court are able to fashion interrogatories that disentangle law from fact and ask the jury all of the purely fact questions that are essential to determining the outcome of the case once the disputed issues of law are finally resolved, the rights of the parties to jury trial can be protected even though a final decision on critical legal issues is deferred to a later time. If, however (either because of a preference for doing so or because of a sense that there is no other practical option) the trial

court elects to submit one or more mixed law-fact questions to the jury, full protection of the rights of the parties to have their dispute resolved by the jury to whom the case is first submitted weighs compellingly in favor of the conclusion that applying the use-or-lose principle is essential to fair process and a just disposition of the controversy.

■ We conclude that no party in this case is entitled to have any of the alleged errors it presents in this appeal considered under the harmless error standard of Rule 61. The reason is that each appellant and cross-appellant now complaining of some aspect of the charge to the jury had the right and opportunity to state its contention to the trial judge after completion of the judge's charge (including the trial judge's modification of the charge after hearing objections)— and did not use it. Having failed to make a timely objection, the complaining party is entitled to relief only to prevent a clear miscarriage of justice or otherwise to preserve the integrity of the judicial process. In most instances, nevertheless, we have determined in our review of the record before us that we are not in "grave doubt," as defined in *O'Neal v. McAninch,* —— U.S. ——, 115 S.Ct. 992, and conclude instead that correction of jury instructions at the appropriate time would not have affected the verdict in this case. In each of those instances, since we have determined that the alleged error was harmless, it follows *a fortiori* that no miscarriage of justice has occurred.

Before explaining the relevant characteristics of the record before us that lead to our conclusion, we pause to explain why two kinds of precedents do not apply to the kinds of claims of error before us here. First, an additional standard of appellate review was invoked to allow new contentions to be considered on the merits, in "special circumstances," in *Newport v. Fact Concerts, Inc.* 453 U.S. 247, 256, 101 S.Ct. 2748, 2754, 69 L.Ed.2d 616 (1981). That case, however, is easily distinguished from the present appeal; it involved equitable relief and did not involve alleged infringements of the rights of parties, in a case tried before a jury, to have disputed fact questions finally decided by the jury empaneled to try the case.

The second kind of inapplicable precedent is a development under the rubric of "waiver." In criminal cases, precedents have added a distinctive element to procedural-preclusion analysis by recognizing that in some instances, even when the court is satisfied that "plain error" was committed, still the appealing party may be barred by circumstances that constitute "waiver." In *Olano* the Court stated:

> Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." ... Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake.... Mere forfeiture, as opposed to waiver, does not extinguish an "error" under Rule 52(b).... If a legal rule was violated during the District Court proceedings, and if the defendant did not waive the rule, then there has been an "error" within the meaning of Rule 52(b) despite the absence of a timely objection.

*Marder,* 48 F.3d at 570 (quoting *Olano,* —— U.S. at ——, 113 S.Ct. at 1777).

Recently a panel of this circuit has observed that there have been "conflicting signals" on the scope and nature of a waiver. *See Marder,* 48 F.3d at 570 (comparing *United States v. Rojo–Alvarez,* 944 F.2d 959, 971 (1st Cir.1991); *United States v. Espinal,* 757 F.2d 423, 426 (1st Cir.1985); *United States v. Drougas,* 748 F.2d 8, 30 (1st Cir.1984); and *United States v. Kakley,* 741 F.2d 1, 3 (1st Cir.), *cert. denied,* 469 U.S. 887, 105 S.Ct. 261, 83 L.Ed.2d 197 (1984)). Because in this case we have concluded that we are satisfied that correction of the errors called to our attention would not have affected the verdict, in any event, we need not consider whether "waiver" in the *Olano* sense may be extended to the civil context (and might then be an additional reason for concluding that appellants (and cross-appellants) cannot prevail on this appeal). "Forfeiture" in the *Olano* sense is a concept quite similar to principles

underlying enforcement of timeliness requirements. We next turn to applying those principles to the claims of error asserted in this appeal.

## IV. ERROR IN INSTRUCTIONS ON SCARFO'S SEX DISCRIMINATION CLAIM

■ As noted in Part II.A above, the instruction on Scarfo's sex discrimination claim was flawed in its treatment of the issue of causation because it understated plaintiff's burden of proof. Is the effect of the error so egregious as to warrant reversal even though defendants did not object at the time and in the manner prescribed by Civil Rule 51? Because we conclude that the jury would have reached the same verdict even had it been properly instructed, the error was harmless. Thus, it readily follows that no miscarriage of justice or other blight on the judicial process has resulted from the error.

The evidence of discrimination is powerful. It contains numerous examples of Cabletron's different treatment of Scarfo and her male colleagues who were similarly situated. On the other hand, it is also true that some evidence in the record tends to support defendants' theory that Scarfo was fired for legitimate business reasons. In these circumstances, we must explain the evidence of record in somewhat greater detail.

Of course, a jury is not required to credit a plaintiff's evidence, even if the evidence is uncontradicted, and neither are we. But a realistic assessment of the likelihood of a different verdict in this case, had different instructions been given, depends in part on an examination of the strength of Scarfo's evidence and the findings it would support. We summarize that evidence.

The strongest evidence on record supporting defendants' theory was the review of Scarfo by Brian Miller, Scarfo's immediate supervisor at Cabletron. Miller's report contained several positive comments. But negative remarks regarding Scarfo's management and purchasing skills dominated his review. Miller also reported internal discipline problems in the purchasing department.

The evidence on record supporting plaintiff Scarfo's theory, however, is overwhelming.

First, Scarfo's requests to improve her department were overlooked while the same requests made by her male replacement were granted. After Scarfo was hired as a buyer and then promoted to purchasing supervisor, she was told that she would not be eligible for a raise until July 1988. Scarfo continued to receive a buyer's salary, though she performed all the functions of a supervisor. But in this position she was repeatedly denied requests to hire additional buyers, train staff, and update equipment so that she could focus on her managerial duties.

After Scarfo was terminated, Justin O'Connor, a purchasing manager, was allowed to hire additional buyers, upgrade equipment, implement training programs, and make other improvements that Scarfo had previously been refused permission to make. Further, unlike Scarfo, O'Connor was permitted to limit his buying responsibilities so that he could devote more time to his managerial responsibilities.

Second, when the purchasing department moved to a larger space, Scarfo was denied an office although her male colleague was given a separate office. Craig Benson, the chief operating officer at Cabletron, did not want Scarfo to have her own office. Benson, however, knew that Tim Jacobs, who was hired with Scarfo, would have a separate office.

Third, Scarfo's business trip expenses were carefully examined. In contrast, the expenses of a male colleague who was on the same trip were not questioned. Specifically, Benson examined Scarfo's expense vouchers for a two-week business trip. He did not review expense vouchers of Roger Lawrence, a male employee who went on the same trip and whose expenses were nearly identical to those of Scarfo.

Fourth, Benson singled out Scarfo to take the blame for an over-purchase of circuit boards, although other employees were involved with this transaction. Scarfo had ordered the boards, but the boards were subsequently not needed. Although Benson knew that others besides Scarfo were responsible

for this over-purchase, he told Miller, "I don't like being ripped off, and I blame Jeanne Scarfo for this."

Fifth, Scarfo was treated differently with respect to stock options. Despite Benson's explanation that Scarfo was omitted from the stock option list and his promise that she would be on the next list of stock recipients, Scarfo, unlike her male counterparts, never received any stock options.

Sixth, in addition to the evidence of these poignant examples of disparate treatment, correlated with gender, there is in the record other strong evidence of discrimination. Scarfo offered evidence that in April 1990, Benson told Miller to hire a "guy" for her position, but Miller refused. Benson said, "I don't care if you fire or demote her, but I want a guy in that position." Approximately ten days later, Miller was fired.

After Miller's departure, Scarfo was demoted to buyer but was asked to continue to perform all management functions. ·

In October 1990, when Justin O'Connor was hired as purchasing manager, Benson told him that he did not like Scarfo and urged O'Connor to fire her. Only ten days after he came onto the job, O'Connor wrote a negative review of Scarfo and placed her on probation through February 1991.

O'Connor terminated Scarfo on January 10, 1991, a month before the probationary period expired. His reason for firing Scarfo was her failure to show improvement. In the circumstances, it would have been· difficult for O'Connor to make a reasonable determination as to whether Scarfo's performance had improved because Scarfo's time records indicated that she was legitimately absent during her probation period.

Taking into account the weight of this evidence of discrimination, we conclude that the error in the jury instructions on Scarfo's Title VII claim was not an error that "seriously affected the fairness, integrity or public reputation of judicial proceedings," *Lash,* 943 F.2d at 152, or caused a miscarriage of justice, *Elgabri,* 964 F.2d at 1259.

We conclude also that no other basis exists in the circumstances of this case to warrant an exception from applying the use-or-lose proposition stated in Rule 51 and explained, in Part III of this Opinion, as a principle aimed at achieving outcomes of jury trial that are fair and just on the merits.

## V. SCARFO'S EQUAL PAY ACT CLAIM

■ By instructing the jury that plaintiff merely had to show disparity of treatment between the sexes and not sex-based discrimination, and by failing to instruct on statutory defenses included in the EPA, the trial court erred.

The EPA reads in relevant part:

No employer ... shall discriminate ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d).

■ The evidence of record overwhelmingly supports a finding for plaintiff (even under a legal standard of intended sex-based discrimination, had the instruction so required). Defendants had the right and opportunity to object to the trial court's instruction and tell the trial judge how to correct the error. As defendants did not use the right, we review the record before us only for evidence of a miscarriage of justice.

In addition to the evidence summarized in Part IV, above, we note additional support in the record for the jury's finding on the EPA claim.

Scarfo's economic expert testified that he reviewed and processed Cabletron data on pay increments, education, and employment history. His analysis showed a $14,000 difference between male and female pay for Cabletron managers and supervisors. The

program accounted for education and seniority.

Further, the evidence in the record before the jury, and before us, includes data from personnel files for men and women holding similar positions. For example, at the same time Cabletron hired Scarfo, it hired Tim Jacobs. Unlike Scarfo, who was paid a starting salary of $27,000, Jacobs was given the title of supervisor and paid a starting salary of $35,000.

Moreover, in 1990, Cabletron hired Justin O'Connor as purchasing manager at a salary of $65,000.

In an attempt to justify this pay discrepancy, defendants call attention to evidence that O'Connor had more education and vastly greater experience than Scarfo. Given the strength of the evidence supporting the EPA claim, however, it is very unlikely that the jury would have returned a different verdict had the error in the instruction been corrected before they deliberated.

## VI. SCARFO'S APPEAL OF HER HOSTILE ENVIRONMENT CLAIM

### A. The Form of Scarfo's Objection to the Charge and Request for Instruction

■ Scarfo presents on appeal a contention that she frames as a single alleged error in the charge to the jury on her hostile environment claim. In our view, however, the contention raises two issues that, though interwoven and related, involve distinct points, neither of which was clearly expressed in the objection before the trial court.

First, Scarfo argues that the court erred in instructing the jury that Scarfo had to prove "unreasonable interference with her work performance" as an *element* of her claim.

Second, Scarfo argues, at least implicitly, that the court should have instructed that in order to show such interference, the plaintiff did not need to prove that her tangible productivity had declined, but only that the harassment so altered her working conditions as to make it more difficult for her to do the job.

Defendants argue that the objection, quoted from the transcript in Part II.C above, lacked the specificity and distinctness required by Rule 51 to preserve for appeal any issue regarding the instructions to the jury on the hostile environment claim. *See* Fed. R.Civ.P. 51.

We conclude that the language of the objection is less explicit than a well-crafted objection should be. Although the objection was sufficient to inform the trial court that Scarfo contended she was entitled to a "factors" instruction as part of the Title VII charge, it failed to proffer a correct instruction or in any other way to explain how the alleged error in the charge could be corrected. Also, the objection failed to identify explicitly the second of the two issues stated above, and to explain how the alleged error could be corrected.

Plaintiff Scarfo's objection thus fell short of the clarity and precision required to alert the trial judge to the contentions now advanced on appeal. It matters not whether Scarfo had by that time formulated the contentions as they are now argued (rather than developing them through further reflection during later proceedings, either in the trial court after verdict, or on appeal). In any event, the trial court was not alerted to the contentions now advanced.

We discuss the two related but separable issues in turn.

### B. "Unreasonable Interference" As a Factor, Not an Element

■ Plaintiff Scarfo says that the court erred in its instruction to the jury that the plaintiff must prove by a preponderance of the evidence an abusive work environment that "unreasonably interfered with her work performance." Plaintiff argues, citing *Harris*, that "unreasonable interference" was not a separate *element* of the claim (failure to prove which would be fatal to the claim), but only a factor to be considered along with all other relevant factors in determining whether an abusive work environment had been proved.

In Scarfo's favor, we accept the point that the terms "element" and "factor", as they

appear in judicial opinions and commentaries, often signify a key difference between two types of legal tests prescribed by law, for use by decisionmakers (juries or judges), in determining whether the evidence in a particular case satisfies the requirements for a legal theory (of a claim or defense).

One type of legal test prescribes two or more "elements" of a claim or defense. Each "element" must be satisfied. Failure to satisfy any one among two or more "elements" is fatal to the claim or defense for which the legal test was prescribed by law, even if all other elements are proved beyond doubt.

The other type of legal test prescribes that two or more "factors" are to be weighed and evaluated in making a single "evaluative" determination that takes account of all of the evidence bearing on all of the "factors." Weakness of the showing of one factor, or even total failure to show it, is not fatal; a strong showing as to other factors may outweigh the deficiency.

Whatever the law may have been previously, *Harris v. Forklift Sys.*, ——— U.S. ———, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), leaves no doubt that the legal test prescribed by Title VII, as interpreted by the Supreme Court, is, in part at least, a factors-type test.

> Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.... [W]hile psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at ———, 114 S.Ct. at 371. Thus, that discriminatory conduct unreasonably interferes with the plaintiff's work performance is not an *element*, proof of which is essential, but a *factor* to be considered in determining whether an "abusive" or "hostile" environment has been proved.

The legal test set forth in *Harris* is in fact neither entirely an "elements" test nor entirely a "factors" test. Instead, the *Harris*

test has both elements and factors within it. First, it is comprised of several "elements"— each alone fatal to the claim if not satisfied. One of these "elements" is that the work environment was "hostile" or "abusive."

Second, the test (or "sub-test," one may prefer to say, to distinguish between the overall test and the internal test for one "element") for determining whether one of the "elements" has been satisfied is a "factors" type of test. More specifically, one of the elements of the *Harris* test is proof that the environment in which the plaintiff worked was "hostile" or "abusive." And the test (or sub-test) for determining whether this "element" has been satisfied in a particular case is a "factors" test. The passage from *Harris*, quoted immediately above, identifies both of these two characteristics of the legal test set forth by the Court in that case.

This reading of the Opinion for a unanimous Court is reinforced by the Concurring Opinions of both Justice Scalia and Justice Ginsburg. Justice Scalia noted that

> "[o]ne of the factors mentioned in the Court's nonexhaustive list—whether the conduct unreasonably interferes with an employee's work performance—would, if it were made an absolute test, provide greater guidance to juries and employers. But I see no basis for such a limitation in the language of the statute."

*Id.* at ———, 114 S.Ct. at 372 (Scalia, J., concurring). Justice Ginsburg, using the word "dominantly" rather than an absolute or conclusive term, also recognized that "unreasonable interference with work performance" was not alone decisive as to whether an abusive environment exists.

> [T]he adjudicator's inquiry should center, dominantly, on whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance.

*Id.* at ———, 114 S.Ct. at 372 (Ginsburg, J., concurring).

Thus, the trial court's instruction was incorrect in stating that "unreasonable[e] interfere[nce] with her work performance" was an absolute requirement for showing the exis-

tence of a hostile or abusive work environment.

The problem is that plaintiff Scarfo did not properly preserve this issue for appeal because plaintiff Scarfo's statement to the trial court of the grounds of her objection was deficient in several ways.

First, it was susceptible of being interpreted as saying that the *Harris* test is entirely a "factors" test. It did not acknowledge that the *Harris* test is in some respects an "elements" test, one element being that the work environment was hostile or abusive. Thus, the trial judge was not alerted to why his use of the language of an "elements" test in the charge might be error because of the particular way he used it, even though language such as his would be proper and even essential as part of an entirely correct instruction.

Second, the objection did not correctly formulate the *Harris* "element" over which there was dispute and satisfaction of which must be determined by a "factors" test (or sub-test). Thus, even if the trial judge understood plaintiff's contention that some aspect, at least, of the overall *Harris* test was a "factors" test (or sub-test) for deciding whether one "element" was satisfied, still the objection did not formulate that element clearly enough to tell the trial judge how to correct the alleged error in his instruction. That "element," as now clearly formulated on appeal, is not "unreasonable interference with work performance." It is, instead, that the work environment was hostile or abusive.

■ In general, objections to a trial judge's charge to the jury must be clear enough and explicit enough to tell the trial judge what the party wishes the trial judge to say in order to correct the alleged error.

> *See Linn v. Andover Newton Theological Sch., Inc.,* 874 F.2d 1 (1st Cir.1989) ("If there is a problem with the instructions, the judge must be told precisely what the problem is, and as importantly, what the attorney would consider a satisfactory cure.").

For the reasons stated above, we conclude that plaintiff Scarfo's objection was not sufficient to preserve the issue for appeal in accordance with Rule 51. Since the plaintiff failed to make a timely objection, we will reverse or award a new trial only if we determine, based on our review of the record, that the error resulted in a miscarriage of justice or "seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Lash v. Cutts,* 943 F.2d at 152.

■ It is true that the court's explanation of what constitutes a "hostile or abusive environment" did not precisely conform with *Harris.* *Harris,* however, does not prescribe a particular instruction on what constitutes a hostile or abusive work environment. Rather, it clearly implies that its list of factors is nonexhaustive.

> *See Harris,* —— U.S. at ——, 114 S.Ct. at 371 ("Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances, *which may include* the frequency of the discriminatory conduct, its severity. . . .") (emphasis added).

We have no basis for concluding now—if, indeed, Scarfo is asking us to do so—that the jury interpreted the court's instruction to mean that "unreasonable interference" was the only factor they were allowed to consider in determining the existence of a hostile or abusive environment. Also, we have no basis for determining that the jury, in deciding whether the work environment was hostile or abusive, did not consider, as part of their understanding of the instruction, factors such as "the frequency of the discriminatory conduct; its severity; [and] whether it is physically threatening." *Id.* We conclude that it is very unlikely that the jury, if it had been instructed correctly, would have returned a different verdict. Thus, no miscarriage of justice occurred.

In summary, we are left with no good reason not to apply the use-or-lose principle in view of the lack of clarity of the objection made by Scarfo at the time prescribed by Rule 51.

## C. Meaning of "Unreasonable Interference With Work Performance"

■ Plaintiff–Appellant Scarfo raises a second, related issue with respect to the

court's instruction on her sexual harassment claim. She argues that the court's instruction was erroneous because it required the jury to find that the plaintiff's work performance was *inadequate* and that harassing discriminatory conduct was a cause of that inadequacy. Plaintiff asserts on appeal that she never intended to prove that the quality or quantity of her work performance declined as a result of her treatment; the plaintiff's theory of her case was that she continued to perform well despite the sexual harassment. Thus, she contends that the court's instruction precluded the jury from considering her theory that the discriminatory conduct adversely affected her work conditions, but not the quality of her performance.

Was Scarfo's objection to the trial court sufficient to alert the court to the refinement of her theory of the case that she now argues before us?

The relevant portion of her objection stated:

And we had requested in our Jury Instruction 22 a paragraph that was not given but that comes from the recent Harris case that says that you don't have to have the unreasonable interference with the work performance. It can be harassment that affects psychological well-being and detract[s] from one's work and we would like to have that instruction given....

Plaintiff's counsel's use of the phrase "detract[s] from one's work" was not sufficient to apprise the trial court of the plaintiff's contention that there was no decline in her productivity and instead only a hostile or abusive alteration of her working conditions, over which she had the wit and will to triumph, thus performing up to full productivity.

*See United States v. Slade*, 980 F.2d 27 (1st Cir.1992) (passing allusions are not adequate to preserve an argument in either a trial or appellate setting); *Linn*, 874 F.2d at 5.

Although plaintiff-cross-appellant's brief in this court points to Justice Ginsburg's discussion of this issue in her concurrence in *Harris v. Forklift*, Justice Ginsburg's discussion was not the subject of any of the plaintiffs' proposed instructions in the trial court.

Plaintiff's proposed Jury Instruction 22 does include a paragraph from the Opinion for the unanimous Court in *Harris*, but that paragraph does not speak to this issue.

The trial judge could not be expected to glean the substance of the present argument from plaintiff's counsel's statements and requests. Thus, the plaintiff failed to object specifically on this ground as required by Fed.R.Civ.P. 51.

Plaintiff Scarfo correctly notes that Justice Ginsburg made a statement in her concurrence in *Harris* that supports the argument plaintiff now makes.

To show such interference, "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment." It suffices to prove that a reasonable person subject to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to "make it more difficult to do the job."

*Harris v. Forklift,* —— U.S. at ——, 114 S.Ct. at 372 (Ginsburg, J., concurring) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir.1988), *cert. denied,* 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989) (a case concerning race-based discrimination)). But it is also relevant that Justice Ginsburg's explanation of the meaning of "unreasonable interference" was neither expressly adopted nor disavowed by the Opinion for the unanimous Court.

For the reasons stated below, we have no need to decide, and refrain from deciding, whether, had a more explicit objection been made, the trial court should have adopted Justice Ginsburg's interpretation of "unreasonable interference with work performance."

■ Even if we assume that the quoted passage from Justice Ginsburg's concurrence is also the view of the Court, we conclude that plaintiff Scarfo has not met her burden of showing that an exception to the use-or-lose principle should be invoked here. The trial court's instruction on plaintiff's sexual harassment claim did not elaborate on the phrase "unreasonable interference with work

performance." That instruction did not preclude the jury from considering the theory of her case that plaintiff Scarfo now emphasizes—the theory that her working conditions had been unreasonably altered even though her performance was not affected. Justice Ginsburg's concurrence treats the phrase "interference with the plaintiff's work performance" as including an alteration of the working conditions that makes it harder to do the job. Nothing in any of the opinions in *Harris* suggests, as plaintiff now does on appeal, that this phrase can be interpreted to mean *only* a tangible decline in productivity. In addition, the plaintiff has not shown any basis for our concluding that the particular instruction at issue in this case, either as a whole or in part, gave the jury the impression that a tangible decline in productivity was something the plaintiff was required to prove as an element of her claim.

Viewed another way, plaintiff's argument on appeal is that the trial court should have given an instruction stating that the plaintiff can prove unreasonable interference with work performance either (1) by proving that the discriminatory conduct would cause the quality or quantity of a reasonable person's work to decline and the plaintiff's work did so decline; or (2) by proving that a reasonable person, subjected to the harassment that she proved, would find, and the plaintiff did so find, that the harassment so altered working conditions as to make it more difficult to do the job. If Scarfo thought that such an instruction would have been helpful to the jury's understanding of her claim, Scarfo had the right and opportunity to make such a request. No such request was made at the critical moment prescribed by Rule 51.

## D. Plaintiff Scarfo's Argument That the Evidence Compelled a Finding for Her

Appellant Scarfo argues, alternatively, that the evidence in support of her claim of sexual harassment was so overwhelming as to compel a verdict in her favor.

We do not reach the merits of her contention, however, because she did not preserve the issue for appeal. She could have preserved the issue by moving for judgment as a matter of law under Rule 50, or by moving for a new trial under Rule 59. *See Wells Real Estate v. Greater Lowell Bd. of Realtors,* 850 F.2d 803, 810 (1st Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988) (waiver of the right to request judgment as a matter of law does not preclude a party from moving for a new trial). Her failure to do either is fatal to her appeal on grounds of sufficiency or weight of the evidence, as was made clear in *Wells.*

We do not reach the issue of the sufficiency of the evidence ... because plaintiff's counsel failed to move for a judgment notwithstanding the verdict in the district court. Therefore we have no decision of the district court to consider.... Appellate review may be obtained only on the specific ground stated in the motion for directed verdict....

A federal appellate court may not reverse for insufficiency of the evidence in the absence of an unwaived motion for directed verdict....

. . . . .

The authority to grant a new trial is confided almost entirely to the exercise of discretion on the part of the trial court....

Where ... the district court's ruling would call into play a discretionary matter, peculiarly appropriate for that court, it becomes more important to bring the error first to that court's attention. Thus, a motion for new trial must be made in the first instance before the trial court, particularly where the weight of the evidence is at issue.

*Wells,* 850 F.2d at 810–11 (citations and quotations omitted).

*See also Havinga v. Crowley Towing and Transp. Co.,* 24 F.3d 1480, 1483 n. 5 (1st Cir.1994);

*Velázquez v. Figueroa–Gómez,* 996 F.2d 425, 426–27 (1st Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993);

*Pinkham v. Burgess,* 933 F.2d 1066, 1070 (1st Cir.1991).

Appellant clings to our statement in *Sampson v. Eaton Corp.,* 809 F.2d 156, 161 (1st Cir.1987), that a post-trial motion is not al-

ways required to preserve an issue for appeal. She maintains that we should review her appeal because it is based solely on a contention of law. The only strictly legal question raised by her appeal on the harassment claim, however, is the propriety of the jury instruction. We have addressed that matter in Part VI.B and VI.C, *supra.*

Her alternative argument that the evidence compelled a verdict in her favor—although a contention "of law"—is plainly based on assertions about the "sufficiency" of the evidence. This kind of contention is controlled by *Wells.*

Appellant also argues that a substantial policy reason mitigates against a conclusion that she has failed to preserve her contention for appeal. She maintains that if this court requires every party to file a motion for new trial as a prerequisite to appeal, then even parties who prevail on all of their claims except one—and decide against appealing the minor loss—must move for a new trial in anticipation of filing a cross-appeal if the other party should appeal. Such post-trial procedure, appellant urges us to conclude, would unnecessarily clog the docket.

Appellant first raised this policy argument in her reply brief, affording appellees no opportunity to respond. In any event, it is unconvincing. At least where, as here, no satisfactory explanation has been advanced for appellant's failure to seek a new trial, we conclude that it is appropriate for us to take account of the fact that trial counsel had the opportunity to decide, and may in fact have decided, that the potential costs of a new trial outweighed the potential benefits. She could have eased to some extent the burdens of such a decision at the post-trial stage, by moving for new trial only as an alternative to a motion for judgment as a matter of law. In any event, it would plainly be inconsistent with the letter and spirit of Rule 59 to give her a second opportunity to seek a new trial now when she did not use the opportunity available to her at the time prescribed by Rule 59.

We have also considered whether the recent decision in *Lebrón v. National R.R. Passenger Corp.,* —— U.S. ——, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), might salvage

Scarfo's right to complain of this error at this time. We conclude that it does not, for reasons that apply also to another claim of error (one advanced by defendant Benson), as explained in Part IX, *infra.*

## VII. MILLER'S WRONGFUL DISCHARGE CLAIM

Miller argues that the court erred in refusing to instruct on nonpecuniary damages. Cabletron responds that in fact the court did instruct on this subject. The record reveals good reason for confusion over this matter.

During a colloquy with counsel before the closing arguments, the court stated its intention to instruct the jury on "enhanced compensatory damages," and not to instruct the jury on "nonpecuniary damages." Miller's counsel objected at this point to the omission of an instruction on nonpecuniary damages, and the court expressly restated its intention not to instruct on nonpecuniary damages.

Miller's counsel, in reliance on the court's ruling, argued in his closing that the jury should award enhanced compensatory damages. Miller's counsel did not argue to the jury that it should award nonpecuniary damages.

When the court instructed the jury just after the closing arguments, it instructed on nonpecuniary damages, but did not instruct the jury on enhanced compensatory damages. This was the opposite of the court's previously stated intention.

After the court's instruction in this way, Miller's counsel objected—ostensibly, to apprise the court of the fact that the court's instructions had varied from its stated intention. Miller's counsel requested that "the Court reverse those two consistent with what you described this morning." This statement can reasonably be interpreted as a request for an instruction on enhanced compensatory damages to *replace* the instruction on nonpecuniary damages. Thus, Miller's counsel's statement arguably indicated to the judge that Miller had changed his position since his original request.

Following this colloquy, the court re-instructed the jury on the wrongful discharge claim. This time, the court instructed the jury on enhanced compensatory damages, but did not withdraw its earlier instruction on nonpecuniary damages, or in any other way mention nonpecuniary damages. No further objection was made by Miller's counsel.

It is not clear from the record whether the second instruction was intended to *substitute* for the first instruction, or was intended as an *additional* instruction. The latter interpretation is supported by the form of the verdict, in which the jury was instructed to answer special questions, including the damages questions referred to below.

The jury awarded Miller $995,000 in damages on the wrongful discharge claim, but awarded no "enhanced compensatory damages." *See* Jury Verdict, Questions 4 and 5. Although no question on the verdict form specifically addressed "nonpecuniary damages," Question 4, which refers to damages generally, may reasonably have been construed by the jury to include both pecuniary and nonpecuniary damages.

In these circumstances, the instructions and the verdict form did not preclude the jury from considering an award of nonpecuniary damages in accordance with the original instruction, and the jury's award of $995,000 may have included such an award. Thus, the verdict form together with the instructions does not conclusively demonstrate that, as plaintiff Miller urges, the jury was not instructed on the issue of nonpecuniary damages.

Even if we were to conclude that the jury was not instructed on nonpecuniary damages, counsel's failure to object, after the "substitute" instruction was given, is an obstacle in the way of Miller's asserting error with respect to this instruction on appeal. Moreover, Miller's counsel's apparent reversal of his position—although arguably intended merely to apprise the court of its inconsistency—weighs against allowing Miller to assert his original position on appeal.

In addition to these obstacles is another. Although plaintiff argues that the availability of nonpecuniary damages in a wrongful discharge action is an open question, defendant Cabletron argues that nonpecuniary damages are not available under New Hampshire state law in a wrongful termination case.

*See Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974) (noting that nonpecuniary damages are not available in contract actions, and holding in the context of a wrongful termination claim based on breach of contract that the plaintiff had not proved such damages).

Since the most that can be said for Miller is that this issue is an open question under New Hampshire state law, it is not certain that the trial court's charge, in whatever way it is construed, was contrary to New Hampshire law.

In these circumstances, we conclude that the controversy over this potentially disputable issue of state law has not been properly preserved for decision on this appeal. The error, if any, did not result in a miscarriage of justice.

## VIII. CABLETRON'S AND BENSON'S APPEAL OF MILLER'S WRONGFUL DISCHARGE CLAIM

Appellants Cabletron and Benson ask this court to vacate that part of the district court's judgment making an award to plaintiff Miller on his claim under state common law for wrongful termination. Appellants argue that we should do so either on the ground that New Hampshire would not permit a common law claim for wrongful discharge or on the ground that the district court improvidently exercised supplemental jurisdiction.

Appellants also ask that we set aside the damages award and remand the case for a new trial with appropriate guidance to the district court on the scope of damages. This is in effect a reiteration of the argument that the jury should have been instructed under New Hampshire statutory law rather than common law because, as appellants concede, the principal difference between the two—at least in the context of this case—is in the scope of the remedies available.

Alternatively, appellants ask that this court certify the determinative question of state common law to the New Hampshire Supreme Court.

Appellants contend that this claim should never have been submitted to the jury because New Hampshire's human rights laws, see N.H.Rev.Stat.Ann. § 354–A, provides the exclusive remedy for a claim of retaliatory discharge based on sex discrimination. Appellee Miller responds that appellants did not properly preserve the issue for appeal and that, in any event, the cited statute does not provide an exclusive remedy.

Appellants acknowledge that they never objected to the court's instruction to the jury on the question of damages. The first time appellants gave the trial judge notice of the argument now advanced on appeal was in a post-judgment motion seeking various forms of relief, including vacatur of judgment and a new trial.

Appellants contend that they raised the issue of statutory exclusion of common law remedies for gender discrimination in a motion for summary judgment. Appellants, however, did not "squarely and distinctly," see Rivera–Gómez v. de Castro, 843 F.2d 631, 635 (1st Cir.1988), raise on the merits in their motion for summary judgment the issue of the exclusion by statute of a common law wrongful termination remedy for gender discrimination. Moreover, even if we were to hold that they had done so, still, in seeking relief from this court they face the obstacle that they failed to move on this ground, under Rule 50, for judgment as a matter of law at the close of the evidence. In view of this failure to bring the matter to the attention of the trial court after the close of the evidence at trial, their claim of error on this ground is not available for review under a standard as favorable to appellants as the harmless error standard. See Eastern Mount. Platform Tennis v. Sherwin Williams, 40 F.3d 492, 497 (1st Cir.1994).

■■■ Even if the damages award for Miller's state law claim was based on a legal premise that may not be the way this New Hampshire substantive-law issue is eventually resolved, at some future time, it does not follow that the judgment based upon that legal premise was a miscarriage of justice. The only prejudice that appellants purport to show was an award of damages for pain, suffering, and mental anguish that, they argue, is precluded by the absence of nonpecuniary damages from the statutory specification of exclusive remedies. Even were we to accept this assertion, and hence conclude that plaintiffs were not legally entitled to damages for pain, suffering, and mental anguish, the point remains that the record contains evidence of other elements of damages—evidence more compelling than any evidence of pain, suffering, and anguish. Nor is there any showing that pain, suffering, and anguish were emphasized by Miller in presenting his claims to the jury. Finally, there is some doubt, as explained above, see Part VII, whether the jury could be expected to understand the charge as instructing that they could award damages for pain and suffering. At best, the suggestion of prejudice is quite speculative.

For these reasons, we do not consider on the merits appellants' argument for vacating that part of the judgment making an award to Miller on his claim for wrongful termination under state common law. Nor do we give further consideration to certifying a question to the Supreme Court of New Hampshire when appellants are procedurally barred from raising on the merits the very issue on which they seek certification.

■■■ We also do not consider whether we should vacate this part of the judgment on the ground that the district court improvidently exercised supplemental jurisdiction. Appellants did not brief this issue on appeal, see Brown v. Trustees of Boston University, 891 F.2d 337, 352 (1st Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990), and in any event are precluded from raising the issue by their failure to object to the instruction on the wrongful termination claim.

## IX. DEFENDANT BENSON'S APPEAL OF THE TITLE VII CLAIMS

Appellant Benson asks this court to vacate the Title VII liability findings against him in favor of both Scarfo and Miller and to deter-

mine that the district court should have dismissed the Title VII claim against him because, as a matter of law, an individual cannot be liable under Title VII.

Benson squarely raised this issue in a motion for summary judgment filed against plaintiff Miller. Appellant Benson concedes that he did not seek summary judgment against the other plaintiff, Scarfo, on this ground. He contends, though, that the district judge's later consolidation of plaintiffs' cases and express order that the defendants' motion for summary judgment in the Miller case be transferred to the main case and considered re-filed in that case, rendered the summary judgment motion applicable to plaintiff Scarfo. We decline to accept this contention. To accept it would imply that it would be appropriate to enter summary judgment against a party who never had explicit notice that her opponent had moved for summary judgment against her. Therefore, we consider Benson's contentions only as they apply to his appeal of the judgment against him for his retaliatory firing of Miller.

■ After the trial court denied Benson's motion for summary judgment as to Miller's claim of individual Title VII liability, Benson did not raise the issue again in the trial court on a Rule 50 motion for judgment as a matter of law. Thus, the claim of error by the trial court in concluding, as a basis for denying summary judgment, that Miller may be held individually liable is not available for review under a standard as favorable to appellants as the harmless error standard. *See Eastern Mount. Platform Tennis,* 40 F.3d at 497.

The instruction on Benson's individual liability under Title VII may or may not have been erroneous. The trial judge made clear that on this point he was adopting the view of a district court of this circuit, and arguably the view of some circuits, over the plainly contrary view of other circuits. As was true of the issue of municipal liability under 42 U.S.C. § 1983 in *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the court's interpretation of the "contours of ... [individual] liability under" Title VII in this case "hardly could give rise to plain judicial error since those contours

are currently in a state of evolving definition and uncertainty." *Id.* at 256, 101 S.Ct. at 2754.

In these circumstances, this ruling of law by the trial court, to which no objection was taken until after verdict, is closely analogous to, if not precisely within, the concept of the law of the case. *See Moore v. Murphy,* 47 F.3d 8, 11 (1st Cir.1995). *See also* Part III, *supra.*

## X. STANDARDS OF REVIEW OF DAMAGES AWARDS

With respect to plaintiffs' Title VII claims, all parties stipulated before trial that the jury would determine liability and the court would calculate damages, if necessary.

With respect to plaintiff Miller's claim under New Hampshire state law for wrongful discharge, the jury determined both liability and damages. Similarly, with respect to plaintiff Scarfo's claim under the Equal Pay Act, the jury determined both liability and damages.

The district court, in its calculation of damages for the Title VII claims, made certain findings of fact as the basis for the awards. This court sets aside such findings only if they are "clearly erroneous." Fed.R.Civ.P. 52(a).

■ This court may, however, modify an award made by the district court when the record is sufficiently developed that the Court of Appeals can apply the law to the trial court's factfindings on the record and calculate the proper award without resorting to remand. *Cf. Lipsett v. Blanco,* 975 F.2d 934, 943 (1st Cir.1992) (modifying an award of fair and reasonable attorneys' fees when the trial court made a legal error with respect to the method of calculation).

Parts XI–XV of this Opinion explain our resolution of the distinct issues that various defendants raise with respect to the amounts of the several awards.

## XI. PLAINTIFF SCARFO'S PRINCIPAL CLAIMS FOR DAMAGES

### A. The Components of Scarfo's Claims

Plaintiff Scarfo was awarded damages on two of her claims: the Title VII sex discrimi-

nation claim and the Equal Pay Act claim. We discuss each of these awards in turn. To aid the reader in understanding the damages analysis, we note that the following dates are relevant to Plaintiff Scarfo's damages. Plaintiff Scarfo was terminated on January 10, 1991. Plaintiff Scarfo filed a claim with the EEOC on March 6, 1991 and filed this civil action with the court below on October 8, 1991. The first of the Orders that, together, constitute the final judgment in this case was entered on May 10, 1994.

### 1. Title VII Claim

The damages awarded to plaintiff Scarfo by the trial court for her successful Title VII claim consist of three types: back pay, front pay, and damages for the value of stock options that plaintiff did not receive as a result of the discrimination.

The court awarded plaintiff Scarfo $1,187,-901.07 in damages for the Title VII violation (consisting of the sum of $242,407.07 in back pay, $744,744 in front pay, and $228,750 for the value of stock, reduced by the jury's award of $28,000 under the Equal Pay Act).

The term back pay refers to lost wages commencing on the date two years before the plaintiff's filing with the EEOC to the date of judgment. Front pay refers to damages for wages from the date of judgment to some specified date in the future.

The back pay and front pay damages awarded by the trial court are to some extent overlapping and must be modified for reasons explained in Part XI.C below.

### 2. The Equal Pay Act Claim

The jury awarded plaintiff Scarfo $28,000 in damages for defendant Cabletron's violation of the Equal Pay Act. The trial court instructed the jury that

Under the Equal Pay Act, Ms. Scarfo's award of unpaid wages is limited to a period of two years prior to filing this lawsuit and extending until her termination unless she proves by a preponderance of the evidence that the violation was willful. If you find that Cabletron acted willfully, then Ms. Scarfo may recover unpaid wages for a period of three years

prior to filing this lawsuit and extending until her termination.

*Cf.* 29 U.S.C. § 155.

We have no need to decide, and thus refrain from deciding, whether this instruction on the law was accurate because neither party objected to the instruction at trial and neither has raised the issue before this court.

The special verdict form does not indicate whether the jury found that the defendant's violation was willful. Thus, assuming, as we must, that the jury followed the court's instructions, the jury's award represents the damages for the time span from October 8 of either 1988 or 1989 up to January 10 of 1991, when plaintiff Scarfo was terminated.

Neither plaintiff Scarfo nor defendant Cabletron challenges the jury's award under the Equal Pay Act of $28,000. There is a lack of clarity in the briefs and record, however, about whether this recovery is in addition to the recovery for violation of Title VII. We discuss this issue in Parts XI.A.3 and XI.E below.

### 3. Combining to a Nonduplicative Total

The award under Title VII is to some extent duplicative of the award under the Equal Pay Act.

Apparently to avoid a duplicate recovery, the trial court subtracted the jury's award of $28,000 for the Equal Pay Act violation committed by Cabletron from the court's total calculation of $1,215,901.07 (consisting of $242,407.07 in back pay, $744,744 in front pay, and $228,750 for the value of stock options) in damages for the Title VII violation committed by Cabletron and Benson, resulting in what the court determined was the total Title VII award of $1,187,901.07 against Benson and Cabletron.

Thus, under the final judgment entered in the case by the court below, defendants Cabletron and Benson were held jointly and severally liable for $1,187,901.07 for the Title VII violation and Cabletron was held liable for an additional $28,000 for the Equal Pay Act violation. Since Benson was not liable under the Equal Pay Act, there is a problem about subtracting $28,000 from the award

against Benson to avoid duplicative recovery. We address this problem in Part XI.E below, along with the need for other modifications.

Defendants Cabletron and Benson raise arguments with respect to all three components of Scarfo's Title VII award. We discuss each component in turn.

## B. Awards to Scarfo for Back Pay

As stated above, the court awarded Scarfo back pay for the Title VII claim in the amount of $242,407.07 (before reduction by $28,000 for the Equal Pay Act award).

Title VII permits an award of back pay starting two years before the date of the filing of plaintiff's complaint with the EEOC (two years before March 6, 1991) up until the date of judgment. 42 U.S.C. § 2000–5(g). Thus, plaintiff Scarfo is entitled to back pay from March 6, 1989 to May 10, 1994. From March 6, 1989 to the date of her termination, January 10, 1991, the damages represent the amount that she was underpaid because of discrimination on the basis of her sex. From January 10, 1991 to May 10, 1994, damages represent the amount she should have been paid, if she had not been terminated on the basis of her sex.

The court performed a detailed set of calculations based on evidence admitted at trial and awarded Scarfo $242,407.07 in back pay (before reduction to avoid duplication). *See* Addendum to Court's Order of May 9, 1994. These calculations separate the time period for back pay into the relevant sub-periods and use the salary rate of an arguably equivalent male employee (as a proxy for what plaintiff Scarfo would have earned in the absence of discrimination) to calculate the damages for each day of each sub-period. Although defendants raise several arguments with respect to these calculations, we determine that the court's findings of fact are not "clearly erroneous" and the method of performing the calculations was in accordance with applicable law.

In particular, the defendants criticize the trial court's use of the salaries of two other Cabletron employees, Mr. O'Connor and Mr. Jacob, in the calculations. Defendants argue that the trial court erred in comparing plaintiff Scarfo to these two employees because these two employees had greater responsibilities at Cabletron. This argument fails because the trial court reasonably could have determined that Scarfo either had a similar level of responsibility or would have been given similar responsibilities but for discrimination.

The court calculated damages up until May 4, 1994, only, instead of May 10, 1994. No party, however, has raised any issue on appeal regarding this period of approximately one week, and we do not disturb the trial court's calculations in this respect.

## C. Scarfo's Front Pay Award

■ The court awarded Scarfo $744,744 as front pay. In a Title VII case, the court has discretion to award front pay from the date of judgment forward when reinstatement is impracticable or impossible.

See *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 890 (3d Cir.1984) ("The award of future lost earnings in Title VII cases is an alternative to the traditional equitable remedy of reinstatement.");

*Cf. Wildman v. Lerner Stores*, 771 F.2d 605 (1st Cir.1985) (court has same discretion to award front pay under the Age Discrimination in Employment Act).

This court will disturb a trial court's front pay award only if we conclude that the trial court abused its discretion, or that findings of fact on which the award was based are clearly erroneous.

The trial court, in its Order of May 10, made the finding that plaintiff Scarfo did not have "the option of returning to her former position at Cabletron." Defendant Cabletron does not challenge this finding, nor is it clearly erroneous.

■ The court also found that plaintiff Scarfo "is a displaced worker and will be unable to find professional employment in the future." Although defendants challenge this determination, the record shows that the court heard expert testimony on the likelihood that plaintiff Scarfo would be able to find an equivalent job with the same earning potential. In light of the evidence that she had only a ten percent chance of returning to

full employment at an equivalent salary, the court's finding that Scarfo will be unable to find professional employment in the future is not clearly erroneous.

Defendants also argue that the "court imported the erroneous concept of displaced worker into the case." The court did not explain the meaning of "displaced worker," nor has our attention been called to any published opinion that uses this terminology in the Title VII context. In any event, regardless of the terminology used, plaintiff Scarfo's ability to find similar employment in the future is relevant both to the trial court's decision to award front pay and to the calculation of such an award. The trial court did not abuse its discretion in awarding front pay to the plaintiff.

In calculating Scarfo's front pay award, the court adopted the calculations of plaintiff's expert witness. Defendants do not dispute that these calculations were admissible and were adequately explained by the expert's report and testimony; rather, they now question merely the weight the court gave to this evidence by pointing out concessions made by the expert during the cross-examination. The defendants' contentions fail because the choice by the court, as factfinder for the purpose of calculating damages, to give probative weight to the expert's calculations was not clearly erroneous.

■ In another respect, however, we conclude that the court erred in adopting and using the expert's calculations as a measure of front pay. The expert's calculation of damages in the amount of $973,494, which the court adopted for Scarfo's front pay award, was for a period commencing on January 1, 1991. As stated above, "front pay" usually refers to an award for future salary payments starting on the date of the judgment, in this case, May 10, 1994. Since the court, in addition to its front pay award, also awarded back pay for the time period up until the date of the verdict on May 4, 1994, plaintiff Scarfo obtained duplicate damages for the period from January 1, 1991 to May 4, 1994.

"[T]he law abhors duplicative recoveries. That is to say, a plaintiff who is injured by reason of a defendant's behavior is, for the most part, entitled to be made whole—not to be enriched." *Dopp v. HTP Corp.*, 947 F.2d 506, 516 (1st Cir.1991). The court adopted the expert's calculations for the front pay award and performed its own calculations to determine the back pay award. Thus, the amounts of the front pay and back pay awards representing the period from January 1, 1991 to May 10, 1994 are different because the expert and the court employed different methods to calculate damages. To avoid duplicative recovery, plaintiff Scarfo's combined total of Title VII damages should be reduced either by the amount the court awarded as back pay for the period from January 1, 1991 to May 10, 1994, or by the amount the court ordered as front pay for that same period.

For two reasons we choose the latter method of determining the measure of the duplication that must be avoided. First, unlike the court's calculations for that period, the expert's calculations include social security contributions and fringe benefits. Therefore, the amount derived from the expert's calculations is a larger amount than the amount calculated by the court for that period. Thus, it is more consistent with our goal of modification only as needed to avoid duplicative recovery to decrease the total award by the smaller amount, that is the amount the court calculated for back pay for that period. Second, since the expert's calculations were computed on an annual basis and the court's calculations were computed on a daily basis, using the back pay measure calculated by the court for the period from January 10, 1991 to May 10, 1994 makes for an easier and more precise calculation of the duplication.

As stated above, the trial court calculated plaintiff Scarfo's Title VII damages to be $1,215,901.07 (before adjustment for the Equal Pay Act award) consisting of $242,-407.07 in back pay, $744,744 in front pay, and $228,750 for the value of stock options. The portion of the court's back pay award attributable to the period for January 1, 1991 to May 10, 1994 is $224,013.12. Thus, to avoid duplication, we reduce the court's calculation of Title VII damages by $224,013.12, resulting in a back pay award of $18,393.95 ($242,-

407.07 less $224,013.12), and a total sum of Title VII damages (before adjustment with respect to Cabletron for the Equal Pay Act award) of $991,887.95, consisting of $18,-393.95 for the period up to January 10, 1991, $744,744 for the period commencing January 10, 1991, and $228,750 for the value of stock options. Both defendants Cabletron and Benson are jointly and severally liable for this amount. This amount does not include the adjustment (discussed below in Part XI.E) for the jury's Equal Pay Act award against Cabletron only.

### D. Scarfo's Damage Award for Stock Options

The court awarded damages to plaintiff Scarfo for the value of stock options she would have received if she had not been discriminated against on the basis of sex. The court found that Scarfo would have been given options to purchase 2500 shares of stock at a purchase price of $15.50. The court found that the value of the stock was $107.00 per share around the time of the trial and awarded Scarfo $228,750 in damages ($107.00 minus $15.50 times 2,500).

Defendants raise only one argument with respect to this damages award; they say that Scarfo is barred from recovering these damages on the basis of res judicata. Before filing the civil action in federal court, Scarfo filed an action with the New Hampshire Department of Labor. In that action, the plaintiff sought to recover compensation under N.H.Rev.Stat.Ann. § 275:51.

See N.H.Rev.Stat.Ann. § 275:51 (authorizing the Commissioner of the New Hampshire Department of Labor to hold hearings to enforce the provisions of certain New Hampshire labor laws).

The Department of Labor determined, *inter alia*, that stock options were not "compensation" and thus not recoverable under N.H.Rev.Stat.Ann. § 275:51.

In her amended complaint to the trial court below, Scarfo sought to recover lost wages and stock options on a breach of contract theory. The district judge dismissed the breach of contract claim on the basis of res judicata because it stated the same cause of action the plaintiff had already adjudicated under N.H.Rev.Stat.Ann. § 275:51.

Defendants assert that because the plaintiff was barred from recovering damages for stock options under a breach of contract theory, the plaintiff should be barred from recovering damages for stock options under a Title VII sex discrimination theory. This argument lacks merit. Under defendants' reasoning, the plaintiff would be barred from recovering any type of lost compensation (including wages) under Title VII, because she had adjudicated a breach of contract claim for lost wages and other compensation in the Department of Labor proceedings. But res judicata bars causes of action, not types of damages recoverable under some other claim not subject to adjudication in the tribunal rendering the judgment.

*See In re Alfred P.,* 126 N.H. 628, 629, 495 A.2d 1264 (1985) ("The doctrine of res judicata precludes the litigation in a later case of matters actually litigated, and matters that could have been litigated, in an earlier action between the same parties for the same cause of action.").

Plaintiff's Title VII cause of action is not the same cause of action as her breach of contract action; it requires different elements to be proved. These different elements were not tried, and could not have been tried, in the New Hampshire Department of Labor hearings. Thus, plaintiff Scarfo's Title VII claim is not barred by res judicata.

Since the defendants raise no other arguments with respect to the trial court's award of $228,750 for the value of stock options not received by plaintiff Scarfo, we do not disturb the trial court's award.

### E. Avoiding Duplication of the Equal Pay Act Award

As described above, the trial court originally calculated Title VII damages to be $1,215,901.07. Then, recognizing the need to avoid duplicative recovery, the court subtracted $28,000 for the Equal Pay Act claim. Thus, under the final judgment entered by the court (as gleaned from the collection of Orders referred to in Part II, *supra* ) Cabletron was held liable for $1,187,901.07 for the

Title VII violation and $28,000 for the Equal Pay Act violation.

Defendants argue that the court erred in subtracting the Equal Pay Act award from the back pay component of the court's Title VII award. We agree that the method used by the trial court to avoid duplicate recoveries was at best confusing, if not erroneous, for two reasons. First, the back pay component of the Title VII damages award and the jury's Equal Pay Act award represent damages for different time periods. Second, only defendant Cabletron (and not defendant Benson) is liable under the Equal Pay Act. Thus, we make the following additional adjustment.

In Part XI.C above, our modification of the total Title VII damages resulted in a calculation of Title VII damages in the amount of $991,887.95. The remaining question before us is how appropriately to modify this award to avoid duplicative recovery by plaintiff Scarfo.

The portion of our modified Title VII damages calculation representing damages from March 6, 1989 to January 1, 1991 is $18,393.95. The jury's Equal Pay Act award of $28,000 represents damages for the same injury, namely discrimination in pay on the basis of sex, for a period commencing either October 8, 1988 or October 8, 1989 and extending to January 10, 1991, the date of her termination. Thus, regardless of whether the jury found willfulness, these time periods overlap to some extent.

We consider separately the two cases (the two different periods, and as a result the two different methods of calculation to avoid an overlap).

If the jury found willfulness, the EPA award of $28,000 represents the period from October 8, 1988 to January 10, 1991. This time period is longer than, and includes entirely the time period of March 6, 1989 to January 1, 1991, for which damages were calculated at $18,393.95. Thus, if the jury found willfulness, the appropriate way to avoid duplicative recovery is to reduce the Equal Pay Act award by $18,393.95, so that Cabletron is liable to plaintiff Scarfo for $991,887.95 for the Title VII violation and an additional $9,606.05 for the Equal Pay Act violation.

If the jury did not find willfulness, the Equal Pay Act award of $28,000 represents the period from October 8, 1989 to January 10, 1991. This is a shorter time period than the time period from March 6, 1989 to January 1, 1991 for which the judge awarded $18,393.95. If we could determine that the jury did not find willfulness, the more accurate adjustment we could make to avoid duplicative recovery would be to reduce the Equal Pay Act award by $12,367.55, the amount of the Title VII award representing damages from October 8, 1989 to January 1, 1991.

Since we cannot determine whether the jury found willfulness, we conclude that it is appropriate in these circumstances to accept the reduction of $18,393.95 as an appropriate adjustment to avoid overlap (instead of the reduction of $12,367.55). If, in fact, the jury's award was not based on a finding of willfulness and accordingly the appropriate adjustment is a reduction of $12,367.55, then the prejudice to plaintiff Scarfo is quite small (i.e., $6,026.40) in comparison either with her total recovery or with the cost to her, as well as to opposing parties and the public, of a remand for a new trial on the sole issue of whether Cabletron's Equal Pay Act violation was wilful. Having failed to request an explicit jury finding as to wilfulness, Scarfo is in no position to complain of this resolution of the issue.

Thus, after the reduction of $18,393.95 to avoid overlap, Cabletron is liable to plaintiff Scarfo for $991,887.95 for the Title VII violation and an additional $9,606.05 for the Equal Pay Act violation.

Since the Equal Pay Act claim was not brought against defendant Benson, Benson is liable only for Title VII damages. In accordance with the explanation above, Benson is jointly and severally liable to Scarfo for Title VII damage totalling $991,887.95 consisting of $18,393.95 for the period before January 10, 1991; $744,744 for the period after January 10, 1991; and $228,750 in stock options.

We emphasize that these adjusted calculations are not intended to alter the usual

terminology and relevant time periods for damages under Title VII. As explained above, a successful plaintiff (one who has proved liability under Title VII) is entitled to back pay for a Title VII violation starting on the date two years before the plaintiff's EEOC filing and continuing until the date of judgment. A court, in its discretion, may also award front pay for a Title VII violation starting on the date of judgment and continuing to some specified date in the future.

## XII. PLAINTIFF MILLER'S DAMAGES

The jury found defendants Cabletron and Benson liable to plaintiff Miller under Title VII for retaliatory discharge. The court awarded plaintiff Miller $190,651.85 in back pay representing lost compensation from the date of his discharge to the date of judgment. The court awarded Miller $995,000 in front pay purportedly representing lost compensation from the date of judgment forward. The court also awarded Miller $206,060 for the value of stock options that he did not receive because of his discharge. These three calculations total $1,391,711.85 in damages for the Title VII violation.

The defendants raise no arguments with respect to the court's back pay award of $190,651.85. We discuss, in turn, the defendants arguments with respect to the front pay damages and the damages for the value of the stock options.

### A. Miller's Damages for Front Pay

Defendants argue that the court's method of calculating damages for front pay was an abuse of discretion. The jury awarded plaintiff Miller $995,000 in damages for Miller's wrongful discharge claim under New Hampshire state law. The court, for a reason not stated, assumed that this sum represented damages for front pay only. Thus, the court incorporated this sum of $995,000 into the court's calculations of Title VII damages as the damages for front pay.

As stated above, we review a court's decision to award front pay damages under the abuse-of-discretion standard. We conclude that the defendants are correct in asserting that the court's decision to use the jury's figure of $995,000 for front pay damages was an abuse of discretion because the jury's award may have included some back pay, some amount for the value of the stock options, and some amount as damages for pain and suffering. Plaintiff Miller, in a post-trial motion and in his brief as appellee, agrees that the court erred in this respect.

The jury was instructed that if it found Cabletron liable on the state law wrongful termination claim, it must consider two types of damages:

> First, you must determine the amount of wages and fringe benefits he would have earned through employment with defendant Cabletron … if he had not been discharged on May 30th, 1990, to the date of your verdict. Second, you must determine the amount of future wages and fringe benefits he reasonably would have earned in his employment with Cabletron if he had not been discharged.

This instruction clearly permits the jury to award both back-pay damages and front-pay damages. The verdict form did not require the jury to report the two separately. The $995,000 awarded by the jury is reasonably interpreted as an award for both back pay and front pay. As explained above, the $995,000 may have included, also, damages for pain and suffering. Thus, the court erred in using the jury's award on the state law wrongful termination claim as the measure of front pay damages under Title VII.

At trial, plaintiff Miller's expert testified that $211,000 was the appropriate award for front-pay damages. Plaintiff Miller has asked this court, in correcting for this error, to reduce the award for front-pay damages from $995,000 to $211,000, the amount calculated by plaintiff Miller's expert. Defendants Cabletron and Benson argue that this court should vacate the entire award for front pay because the trial court abused its discretion in deciding to make any award for front pay.

The court below found that Miller did make reasonable efforts to procure employment, but that the courier business he began in 1991 has not yet made a profit. We will not disturb this finding of fact because the defendants have not shown it to be clearly

erroneous. From this finding, we infer that the court also found that it was impracticable for Miller to return to Cabletron and that Miller had made reasonable efforts to find a job with the same earning capacity. Miller is thus entitled to damages for front pay. The court's determination that Miller was entitled to an award of front pay was not an abuse of discretion, and we will not disturb that determination.

Plaintiff's proposal to this court that the award be reduced from $995,000 to $211,000—if the proposal had been made to and accepted by the trial court—has evidentiary support in the testimony of plaintiff's expert.

■■■ This court has authority to modify a damages award when all the necessary fact-findings have been made in the court below. *Cf. Lipsett,* 975 F.2d at 943 (modifying an award of fair and reasonable attorneys' fees when the trial court made a legal error with respect to the method of calculation). Reducing the award to $211,000, however, as plaintiff Miller requests, would require this court to evaluate the credibility of the plaintiff's expert and to make a new finding of fact, not made in the trial court, that Miller is entitled to $211,000 in damages for front pay.

Since we do not have the authority to make findings of fact in order to modify the award in the manner requested by plaintiff, we vacate the front pay award.

We remand this case to the district court for the limited purpose of determining an appropriate amount for the front pay award. The district court, on remand, may allow the interested parties a reasonable time period within which to file with the district court a stipulation resolving this issue (for example, a stipulation such as Miller's proposal to this court that his award for front pay be reduced to $211,000 and judgment be entered accordingly). If no such agreement is filed, the trial court is to determine the amount of the award to Miller for front pay. The trial court may find it appropriate to act on the present record of evidence and adopt the plaintiff's calculation of $211,000 for front pay. It may instead calculate front pay damages from the date of judgment (May 10, 1994) forward in some other manner supported by the present record of evidence.

Also, the court, in its discretion and for cause shown, may receive additional evidence bearing upon this issue.

## B. Miller's Damages Award for Stock Options

During his employment, plaintiff Miller was told that, over a specific period of time, he would be given stock options that would allow him to purchase 10,000 shares of stock at a purchase price of $3.97 per share. During his employment, he received options to purchase only 2,000 shares. During the time period from the date of his termination (April 20, 1990) to the date of judgment (May 10, 1994) Miller alleges that he would have received options to purchase 5,000 shares. Miller also alleges that within a month of the date of judgment, his right to options with respect to the remaining 3,000 shares would have vested. Thus, Miller's counsel argued to the trial court that Miller should have been awarded damages for the value of options for 8,000 shares of stock.

The court awarded plaintiff Miller $206,060 in damages for the value of 2,000 shares of stock. The court did not explain how it determined the number 2,000 to be the number of shares of stock.

Defendants-appellants, in their brief on appeal, do not dispute the facts, as alleged by plaintiff Miller, regarding the options for 10,000 shares. In an effort to point out all potential errors made by the district court in support of their argument that this court should vacate both awards entirely, they argue that the trial court erred in deciding to award Miller the value of *2,000* stock options. Defendants suggest that the trial court mistakenly thought that Miller had already *received* stock options for 8,000 of the 10,000 shares, when, in fact, this was the amount he had *not received* because of his termination.

The brief of appellee Miller agrees that the court erred, and suggests (adopting defendants' reasoning in part) that the court should have awarded $824,240, the value of stock options for 8,000 shares.

The implications of defendants' argument on appeal are troubling. They have request-

ed, in the event that this court does not reverse the liability determination on Miller's Title VII claim, that this court set aside Miller's entire damages award and remand. If the remand were limited to trial of the issue of damages for the value of stock, however, the trial court might award either the value of 5,000 shares of stock (the amount vesting before the date of judgment), or the value of 8,000 shares of stock. In either case, the probable consequence of retrying only this issue would be an additional liability, beyond that already awarded by the trial court, of either $309,090 or $618,180 in favor of plaintiff Miller.

Miller's brief as appellee requests that *this* court award damages for the value of stock options for 8,000 shares. Defendants respond that we should not grant this request (which would increase the total damages award) because plaintiff Miller did not appeal the award of damages in his cross-appeal; rather, plaintiff Miller raised this argument only in its appellee brief responding to the defendants' appeal.

We refrain from modifying the judgment to award the value of 8,000 stock options because to do so would require this court to make new findings of fact. We also refrain from remanding this issue to the trial court for the limited purpose of determining an appropriate award for the value of lost stock options because neither party has requested that we do so. Both parties have requested that this court take actions that are beyond this court's authority. Since neither party's position has merit, we simply affirm the trial court's award of $206,060 for the value of stock options for 2,000 shares of stock.

## XIII. PREJUDGMENT INTEREST

### A. The Arguments of the Parties

There is some confusion both in the record and in the parties' briefs about whether the court awarded prejudgment interest on any part of Scarfo's damages award and whether prejudgment interest, if awarded, was appropriate. Defendants argue that the court awarded prejudgment interest on Scarfo's Title VII award, and that this was error. Plaintiff Scarfo argues that the trial court

refused to award prejudgment interest on Scarfo's Title VII award.

We conclude from a review of the record that the trial court denied prejudgment interest on every element of the award to plaintiff Scarfo. In answer to Question 6 of the verdict form, the jury answered "NO," finding against Scarfo on her prejudgment interest claim. By its Order of July 20, 1994, the court stated as to all of Scarfo's claims, "Prejudgment interest is disallowed."

With respect to the judgment for plaintiff Miller, the defendants have not raised on appeal any objection to the trial court's award of prejudgment interest on Miller's state law wrongful termination claim at the rate of 10% per annum, as mandated by N.H.Rev.Stat.Ann. § 524:1–b and § 336:1. With respect to Miller's Title VII award, however, there is some confusion in the parties' briefs about whether the parties understood that the court awarded prejudgment interest on any part of the award. The parties' briefs assume that prejudgment interest was awarded on the entire Title VII award. From this premise, the parties dispute whether it was appropriate for the court to award prejudgment interest on the front pay award and the portion of the back pay award representing damages for the period from the date Miller's complaint was filed to the date of judgment.

We conclude from a review of the record that the trial court allowed prejudgment interest on Miller's state law claim for wrongful termination, but not on any aspect of his Title VII claim. In its answer to Question 6 of the verdict form, the jury answered "NO," thus finding against Miller on his claim for prejudgment interest. But in his Order of July 19, 1994, the trial judge "abrogate[d]" that finding insofar as it applied to the state law claim for wrongful termination and awarded Miller prejudgment interest from the date of filing of the complaint to the date of the verdict.

Since, contrary to the contentions of the parties, we have concluded that the trial court did not award prejudgment interest on plaintiff Scarfo's and plaintiff Miller's Title VII awards, the only question remaining is whether the trial court erred by denying

prejudgment interest on all aspects of the plaintiffs' Title VII awards.

 A trial court has discretion whether to award prejudgment interest on a successful Title VII claim.

> *See Earnhardt v. Puerto Rico,* 744 F.2d 1, 3 (1st Cir.1984) (in a Title VII case the question of "whether [prejudgment interest is] necessary to make the plaintiff whole is within the discretion of the district court").

In view of the discretion allowed the trial court as to interest on a Title VII award, we conclude, in the circumstances of this case, that the trial court did not abuse its discretion in declining to award prejudgment interest on the Title VII award. Thus, as stated below in the Conclusion, we affirm the trial court's decision not to award prejudgment interest on both plaintiffs' Title VII claims.

### B. Front Pay Awards

For an additional reason, we affirm the trial court's denial of prejudgment interest on the front pay components of both plaintiffs' Title VII damages awards. Interest is ordinarily awarded to compensate for the lost use of funds. Since the front pay awards represent damages for wages the plaintiffs would have received in the future, after the date of judgment, the plaintiffs had not lost use of these funds before the judgment was ordered.

> *Cf. Conway v. Electro Switch Corp.,* 402 Mass. 385, 523 N.E.2d 255, 258–59 (1988) (prejudgment interest is not available under Massachusetts law for awards of front pay for violations of a Massachusetts anti-discrimination statute).

Moreover, the plaintiffs' experts, in calculating damages for front pay, correctly chose to discount the amounts representing the plaintiffs' future wages at an appropriate interest rate in order to determine the present value of the future stream of income to which each plaintiff would have been entitled.

Thus, as stated in the Conclusion below, we affirm the trial court's denial of prejudgment interest on the front pay components of plaintiffs' Title VII awards.

### C. Awards for the Value of Stock Options

In this case, defendants argue that prejudgment interest should not be awarded on the value of the stock options, since the amount of damages was based on the price of the stock on or near the date of judgment. If the plaintiffs had received the stock options at the time due and had not transferred them, the plaintiffs would have been in possession of shares of stock having the value equal to the purchase price plus the amount of damages. Thus, the damages awards for the stock options already represent the present value of the stock options at the date of judgment. We conclude that an award of prejudgment interest is not necessary to compensate the plaintiffs. Although a reasonable argument may be made that prejudgment interest is an appropriate remedy for the loss of dividends that would have been paid to plaintiffs if they had been in possession of the stock during the period to which they were entitled to it, neither party has argued this proposition. Since both plaintiffs have conceded either explicitly (in Miller's case) or implicitly (in Scarfo's case, to the extent she argues that prejudgment interest was not even awarded) that prejudgment interest on the value of the stock options is not appropriate, we refrain from addressing the argument that prejudgment interest may be awarded as compensation for lost dividends.

Thus, defendants and plaintiffs agree that prejudgment interest was inappropriate on the damages for stock options and we affirm the trial court's denial of prejudgment interest on the stock options components of plaintiffs' Title VII awards.

### XIV. MILLER'S CHOICE OF DAMAGES AWARDS

The orders of the district court that we have determined to be the functional equivalent of a final judgment are silent, and thus perhaps ambiguous, with respect to the effect of the overlap between the judgment for plaintiff Miller on the jury finding of damages in the state law wrongful termination claim and the judgment for plaintiff Miller in the court's findings of damages in the Title VII claim. Separate awards were made for

these two claims, but nothing is stated explicitly about whether and to what extent, and with what effect on collectibility, the elements of harm for which damages are awarded under the two claims overlap.

None of the parties brought this matter to the attention of the trial court. Each party may have been reluctant to do so for fear the ambiguity would then be resolved against it. Having chosen instead to argue their respective positions only on appeal, however, no party is in a favorable position to seek an award of costs of appeal. We award no costs of appeal and cross-appeal from the judgment of the district court with respect to Miller's claims.

To eliminate any uncertainty, we state our determination of the meaning of the judgment, with the modifications we order.

Plaintiff Miller prevailed on two claims: his state law claim for wrongful discharge against Cabletron (and not Benson) and his federal Title VII claim for retaliatory discharge against Cabletron and Benson.

Plaintiff Miller was awarded $995,000 with prejudgment interest at a rate of 10% per annum from the date of the filing of the complaint to the date of the verdict (May 4, 1994) on his New Hampshire state law claim for wrongful termination against Cabletron.

After modification by this court, plaintiff Miller is entitled to three types of damages for his Title VII claim against Cabletron and Benson. First, Miller is entitled to back pay in the amount of $190,651.85 (without prejudgment interest). Second, Miller is entitled to damages for front pay (without prejudgment interest). As stated in Part XII.A *supra*, the trial court will determine, after proceedings on remand, whether to award $211,000 or some different amount as the front pay award. Third, Miller is entitled to damages (without prejudgment interest) for the value of lost stock options in the amount of $206,060.

Since defendant Benson is liable on the Title VII claim (and not the state law claim), Cabletron and Benson are jointly and severally liable for the total amount of the Title VII damages only.

Although defendant Cabletron was found liable on both the state law and federal law claims, plaintiff Miller is not entitled to collect on both claims.

*See Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1345 (1st Cir.1988) ("[P]laintiff is entitled to only one full recovery, no matter how many legal grounds may support the verdict ... but there is no basis for allowing the losing party to pick which of the overlapped awards it prefers to pay. In collecting the fruits of his victory, [plaintiff] was concededly entitled to only a single slice of pie—but the choice of the slice was his.").

In this case, plaintiff Miller may choose the larger of the two damages awards.

If the total Title VII damages award is larger than the award on Miller's state law claim for wrongful discharge, defendants Cabletron and Benson will be jointly and severally liable for the total of the Title VII damages.

If the damages award on the state law claim ($995,000 plus prejudgment interest at the per annum rate of 10%) is larger than the total Title VII award (which, we note, will be the case if the parties stipulate to $211,000 as the front pay award, resulting in a total Title VII award equal to $607,711.65), defendants Cabletron and Benson will be jointly and severally liable for the Title VII damages award and Cabletron will be separately liable for the amount of the award on the state law claim that is in excess of the Title VII award.

## XV. ATTORNEYS' FEES

The status of each plaintiff as a prevailing party is not challenged on appeal. Appellants do challenge, however, the size of each award of attorneys' fees on the ground that it does not account for plaintiff's failure to win at trial on all claims originally made.

Plaintiff Scarfo prevailed on her claim against Cabletron and Benson for sex discrimination and on her claim against Cabletron under the Equal Pay Act. She did not prevail on her claim of sexual harassment against Benson or Cabletron. Her claim for intentional infliction of emotional distress against Cabletron was dismissed, and she

lost on the same claim against Benson at trial. Her claim of breach of contract was dismissed on the ground of res judicata. The defamation claim was not pressed at trial, apparently because it was settled.

Miller prevailed against Cabletron and Benson on his Title VII claim for retaliatory discharge, and against Cabletron on his state-law wrongful termination claim. Although he lost none of his claims that went to the jury (except for prejudgment interest), Miller's claims for abuse of process and intentional infliction of emotional distress were apparently dismissed before or during trial, although on the record before us we cannot tell under what circumstances or on what terms they were dismissed.

Following trial, the court received briefs and held a hearing to determine attorneys' fees. The court awarded fees to Scarfo in the amounts of $225,300.13 for services of the firm that handled the bulk of her case and $18,955 for the services of a firm that handled a small part of the case. The court awarded fees to Miller in the amount of $117,510.97.

■ Appellants assert that the trial court improperly awarded Miller fees related to claims on which he did not prevail at trial—apparently, the dismissed claims of abuse of process and intentional infliction of emotional distress. Yet appellants have failed to provide this court with a record from which we could determine whether the award included the cost of prosecuting these claims.

It is clear from the trial court's order awarding attorneys' fees to Miller that the court had before it a detailed bill for Miller's attorneys' services. Appellants have not made that bill, or any other information sufficient to support a reasoned decision by this court, a part of the record. This court therefore has no basis for determining whether there is any truth to appellants' assertion that the fee award against them included the cost of litigating claims on which Miller did not prevail at trial. In these circumstances, we do not reach the question whether the trial court abused its discretion in its award of fees for the simple reason that we have no basis for a reasoned decision.

■ When an appellant fails to provide a record of evidence material to the point the appellant wishes to raise, and thus leaves the appellate court with an insufficient basis to make a reasoned decision, the court in its discretion may either consider the merits of the case insofar as the record permits, or may dismiss the appeal if the absence of a full record thwarts intelligent and reasoned review. *See Moore,* 47 F.3d at 10.

Appellants assert that the district court did not reduce the award to Scarfo to account for her unsuccessful claims. The support for this assertion consists primarily of a listing of the claims on which plaintiffs did not prevail. Appellants cite a statement of the trial court in a related case in which the court acknowledged that the Title VII and state-law claims involved different defenses and varying remedies, as well as novel issues of state law. Appellants also assert that plaintiffs "failed to establish entitlement to the fees" and "wholly failed to explain many of the general entries which were made."

At the hearing, the trial court heard testimony from Scarfo's lead counsel regarding Scarfo's counsel fees. Counsel testified that the proffered itemized bill did not include work relating to the defamation claim, or work solely related to the harassment claim or the emotional distress claim. She also testified that the fees for which her client sought reimbursement were $75,000 less than the total fees charged. Counsel was subjected to fairly detailed cross-examination, especially regarding the fees attributable to the sexual harassment claim; cross-examination on that topic focused especially on fees for research undertaken on February 2 and February 5, 1993.

The court found that on these two dates, February 2 and 5, 1993, research was undertaken on issues on which plaintiff did not prevail, but that "the issues are interwoven." The court stated that it was reducing the charges allowed for those two days by 50% to $427.50.

■ An award of fees under Title VII is reviewed primarily under an abuse of discretion standard, and the trial court's range of discretion is particularly broad. *See Pheto-*

*somphone v. Allison Reed Group, Inc.,* 984 F.2d 4, 6 (1st Cir.1993). That range extends to determining the portion of bills for services to be awarded to parties who have won on only some of their claims, as long as the trial court considers the relevant factors:

> Where, as here, plaintiffs have won a federal claim for which attorneys' fees are allowed to a prevailing party, the question becomes whether the claims on which they lost in the same suit were unrelated to the successful ones (in which event no fees may be awarded for work on the unsuccessful claims), or whether, instead, the losing claims included "a common core of facts," or were "based on related legal theories," linking them to the successful claim. In the latter event, the award may include compensation for legal work performed on the unsuccessful claims.

*Garrity v. Sununu,* 752 F.2d 727, 734 (1st Cir.1984) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Where the district court gives consideration to these factors, we defer to its judgment absent an abuse of discretion.

> *See id.* at 735;
>
> *see also Lipsett v. Blanco,* 975 F.2d 934, 940 (1st Cir.1992) (the fee in a case involving interrelated claims is an "equitable judgment entrusted to the discretion of the factfinder, to be made on the basis of all the circumstances of the litigation") (citation omitted).

The district court should not only exercise its discretion but also do so demonstrably. It is important

> for the district court to provide a concise but clear explanation of its reasons for the fee award. When an adjustment is requested on the basis of either the exceptional or *limited nature* of the relief obtained by the plaintiff, *the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained.*

*Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (emphasis added). *See also Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 527 (1st Cir.1991) (court must make concrete findings and explain its reasoning). The dis-

trict court's explanation of the bases for its conclusions is essential to meaningful appellate review. *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984).

It is not clear exactly what the legal basis is for appellants' request for a remand. That is, it is not clear whether appellants are contending that the district court did not conduct the analysis required by *Hensley* in cases of interrelated claims, or, instead are contending that the court conducted the analysis, but came to the wrong conclusion. We consider, and reject, both possibilities.

Appellants overstate their case when they assert that the court "made no reduction for counsel fees as a result" of unsuccessful claims. The district court specifically found that on two dates (February 2 and 5, 1993) research was undertaken on issues on which plaintiffs did not prevail, but that "the issues are interwoven"; the court stated that it was reducing the charges allowed for those two days by 50%.

Although we interpret the statement that "the issues are interwoven" as having been intended to invoke the *Hensley* analysis, it is, to be sure, not a sufficient explanation of the basis of the court's award of fees in a case of purportedly interrelated claims. It falls short of the "thorough and detailed opinion reviewing the imbrication between the successful and unsuccessful claims" that was before the court in *Lipsett,* 975 F.2d at 941. In the present case, the district court did not—as far as we can tell on the record before us—"make clear that it considered the relationship between the amount of the fee awarded and the result obtained." *See Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. The court's order does not reflect a *Hensley* analysis of the relationship among the claims; in fact, it does not indicate what issues the court has determined to be interrelated, or even whether they are issues of fact or law.

Nevertheless, our review of the record leads us to conclude that Scarfo's claims of sexual harassment and intentional infliction of emotional distress shared sufficient common issues of fact with her successful claims under Title VII and the Equal Pay Act to justify the award made in this case. In any

event, we conclude that appellants should not now be heard on their request for remand because they did not adequately present this issue to the trial court or in the briefs filed with this court.

The trial court's order, it is true, does not address the nature of legal work performed by Scarfo's counsel beyond the research billed for February 2 and February 5, 1993. But we will not ourselves consider, or remand to the district court for consideration of, a blanket request not specific enough for reasoned evaluation of the merits of the request. Appellants have failed to meet their burden of production before the trial court and their burden of adequate briefing before this court. This failure deprives both courts of an opportunity to make an intelligent and reasoned decision regarding the segregability of fees awarded for any work related to losing claims that took place on days other than February 2 and 5, 1993.

 Parties must fulfill certain obligations of specificity of grounds of claim or defense if the district court is to be able to make a reasoned decision as to a proper fee award. The fee-seeker, for example, must provide a "particularized account" of his or her claim for fees. *Weinberger*, 925 F.2d at 527. When a fee-seeker has not won on all counts but properly documents her claim for fees and plausibly asserts that the time cannot be allocated between successful and unsuccessful counts, it becomes the fee-target's burden to show a basis for segregability. *See Lipsett*, 975 F.2d at 941. Appellants failed to meet this burden.

There was evidence before the district court, in the form of testimony by Scarfo's counsel, that the requested award already reflected a $75,000 deduction from overall costs to account for time spent solely on the sexual harassment and infliction of emotional distress claims; the remainder of her firm's work on these claims, she testified, was closely related to the claims on which her client prevailed. She also testified that the award did not include any expenses related to the defamation claim. That testimony constituted a "plausible assertion" that counsel had already segregated fees to the extent practicable. The credibility of that testimony is

for the trial court, not this court, to determine.

The defendant was free to challenge this assertion by pointing specifically to segregable aspects of the bill that formed the basis for the award. The defendants' cross-examination of Scarfo's counsel regarding expenses billed for February 2 and February 5 apparently convinced the judge that a 50% reduction in the fees for those days was warranted, despite his conclusion that they pertained to "interwoven" issues. Perhaps a further reduction in fees would have followed if defendants had presented an adequate basis for subjecting other billed hours to judicial scrutiny. But defendants did not point to any other purportedly segregable entries in the bill submitted by Scarfo, either during cross-examination or in written submissions contained in the record before us.

Appellants did not even assert in the trial court that the award improperly included fees attributable to the defamation or breach of contract claims.

Plaintiffs' contentions at trial and before this court regarding the segregability of other claims, moreover, are merely statements of conclusions. The written submissions to the trial court contained in the record before us merely stated conclusions that the losing claims "have separate and distinct elements of proof requiring different testimony and documentary evidence" or have a "distinct and separate nature" and are "easily segregated." Appellants' argument of segregability on appeal is even less specific than the arguments advanced before the trial court.

In these circumstances, in which we do not even know what arguments the appellants would make on remand because they have failed to make those arguments to the trial court or to us, we conclude that it would be improper to give appellants another bite at the apple.

Appellants argue to us that plaintiffs "failed to establish entitlement to the fees" and "wholly failed to explain many of the general entries which were made." Even if we were to construe these assertions as arguments independent of the arguments regarding segregability of fees, they are no more

than statements of the conclusion appellants ask us to reach. They do not constitute adequate explanation of a basis for reasoning to this conclusion from evidence of record. We cannot sustain contentions of this kind. *See Brown v. Trustees of Boston Univ.*, 891 F.2d at 352.

For the same reason, we cannot sustain appellants' argument that the award of expert fees was improper.

## XVI. CONCLUSION

We affirm the trial court's judgment for plaintiffs Scarfo and Miller in all respects other than the amount of the damages award, which we modify, as stated below, for the reasons stated in Parts X–XIV of this Opinion.

With respect to plaintiff Miller, on remand the trial court may allow the parties a reasonable time to file a stipulation with respect to the award to Miller for front pay. Absent a stipulation resolving this issue, the district court on remand may, in its discretion, resolve it consistently with this Opinion, either on the present record or by allowing the parties to present additional evidence.

The district court is directed, on remand, to enter an Amended Final Judgment as follows:

(a) judgment for plaintiff Scarfo on her claim under Title VII of the Civil Rights Act for sex discrimination against defendants Cabletron and Benson for the sum of $991,887.95 (consisting of $18,393.95 in back pay, $744,744 in front pay, and $228,-750 for the value of stock options) without prejudgment interest;

(b) judgment for defendant Levine on Scarfo's Title VII claim for sex discrimination against him;

(c) judgment for defendants Cabletron, Benson, and Levine on plaintiff Scarfo's claim under Title VII of the Civil Rights Act for sexual harassment based on a hostile or abusive environment;

(d) as an addition to the amount in paragraph (a), judgment for plaintiff Scarfo against Cabletron (but not against Benson), on her claim under the Equal Pay Act, in the sum of $9,606.05 (being $28,000 less $18,393.95 because of overlap with the award in paragraph (a)), without prejudgment interest;

(e) judgment for defendants Benson and Levine on plaintiff Scarfo's claims for intentional or reckless infliction of emotional distress;

(f) plaintiff Scarfo's claim of intentional or reckless infliction of emotional distress against defendant Cabletron is dismissed;

(g) plaintiff Scarfo's claims for breach of contract and defamation are dismissed;

(h) judgment for plaintiff Miller against defendants Cabletron and Benson, on his claim for retaliatory discharge in violation of Title VII, for [a sum to be determined upon remand] without prejudgment interest consisting of

(i) $190,651.85 in back pay;

(ii) [a sum to be determined upon remand] for front pay; and

(iii) $206,060 for the value of stock options;

(i) judgment for plaintiff Miller against defendant Cabletron (but not against Benson) on his claim under New Hampshire state law for wrongful termination, in the sum of $995,000 with prejudgment interest at a rate of 10% per annum under New Hampshire state law from the date of filing, April 14, 1992, to the date of the verdict, May 4, 1994;

(j) plaintiff Miller's claims of abuse of process and intentional or reckless infliction of emotional distress against Benson, Levine, and Cabletron are dismissed;

(k) all claims by plaintiff Miller against defendant Levine are dismissed;

(*l*) it is further ordered that plaintiff Miller will not be allowed to collect more than the larger of the two awards in his favor against Cabletron as set forth in paragraphs (h) and (i).

(m) judgment for plaintiff Scarfo against defendants Cabletron and Benson, for attorneys' fees and disbursements, in the amount of $244,255.13 (consisting of $225,-300.13 incurred for services of one and $19,955 incurred for services of the other of two firms that represented her);

(n) judgment for plaintiff Miller against defendants Cabletron and Benson, for attorneys' fees and disbursements, in the amount of $117,510.97;

(*o*) the awards in paragraphs (a), (d), (h), (i), (m), and (n) will bear post-judgment interest commencing on May 10, 1994 at the federal post-judgment interest rate of 5.02% per annum (the rate applicable on the date of entry of the original final judgment, May 10, 1994);

(p) costs are awarded to plaintiffs.

This case is remanded for further proceedings consistent with the Opinion of this court and for the entry of an Amended Final Judgment accordingly.

As to the judgment for Scarfo, costs of the appeal are awarded to appellee Scarfo. As to costs of the cross-appeal by Scarfo, costs of the appeal are awarded to cross-appellees. As to the appeal and cross-appeal from the judgment of the district court on Miller's claims, all parties will bear their respective costs of appeal.

It is so ORDERED.